No. 66,895

STATE OF KANSAS, *Appellee,* v. RICHARD COOPER, *Appellant.*

(845 P.2d 631)

Opinion filed January 22, 1993.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Mohd Rana,* legal intern, and *Jessica R. Kunen,* chief appellate defender, were with him on the brief for appellant.

*Debra Byrd,* assistant district attorney, argued the cause, and *Rachelle Worrall Smith,* assistant district attorney, *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: The primary issue addressed in this criminal case is whether the evidence was sufficient to sustain a conviction of rape. Two additional issues, *i.e.,* the admission of a knife and tattoo book into evidence and the failure to instruct on involuntary intoxication, are also considered.

Our jurisdiction is under K.S.A. 1991 Supp. 22-3601(b)(1) (a direct appeal when a maximum sentence of life imprisonment has been imposed).

The standard of review on sufficiency of the evidence is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found defendant guilty beyond a reasonable doubt. *State v. Bailey*, 251 Kan. 156, 163, 834 P.2d 342 (1992). The standard on admissibility of physical evidence is trial court discretion, determined on the basis of relevance to the defendant and the crime charged. *State v. Ji*, 251 Kan. 3, 15, 832 P.2d 1176 (1992).

We apply a clearly erroneous standard in reviewing the failure to give an involuntary intoxication instruction, absent a request for the instruction. The failure to instruct is clearly erroneous only if we reach a firm conviction that there was a real possibility the jury would have returned a different verdict if the instruction had been given. *State v. Perez*, 251 Kan. 736, Syl. ¶ 4, 840 P.2d 1118 (1992).

We find no error and affirm.

### Facts

Cooper was charged with rape (K.S.A. 21-3502) and aggravated criminal sodomy (K.S.A. 21-3506[c]). He was convicted of rape but acquitted on the sodomy charge. We detail the factual situation because the sufficiency of the evidence is at issue.

The Wichita police received a 7:00 a.m. call from Brenda Lake, who told Officer Hipps that she believed N.H., a friend with whom she had been partying, was in danger. Lake's concern arose because of the way Cooper (the defendant) had acted at the party. Lake and the police were unable to locate N.H. The police also received a call the same morning from a Coastal Mart employee regarding an "intoxicated subject that wanted to turn himself in." Officer Hiser arrived at Coastal Mart, located Cooper, and inquired if there was anything he could do to help. Cooper replied that Hiser could "take him in." Cooper "didn't know why," but he thought he had done something wrong. Cooper told Hiser that he had been beaten up in a fight at a party. Hiser indicated that Cooper appeared to be intoxicated.

Officer Novacek also was called to the Coastal Mart. Novacek testified that Cooper told Officer Hiser and her to either leave or take him to jail, that Cooper had a strong odor of alcohol, and that he was having a hard time keeping his eyes open and his head up. From Coastal Mart, Cooper directed Novacek to the location of the party, stating, " '[T]hat's the house.' " Cooper told Novacek that a friend he had "done time with," Jimmy Pottorff, lived in the house and was asleep. Cooper then let Officers Novacek and Hiser into the house.

Officer Novacek testified that when in the house she observed, among other things, several beer cans in the living room area. She indicated that Cooper looked at the living room floor and said, "Oh look. Here's her watch." Cooper also told the officers that there had been two women present at the party and that he had been putting a tattoo on one named N.H.

Cooper was taken to his home by the police. He asked Novacek to come back and pick him up if she found out what had happened because he was sure he had done something but could not remember what. The police returned to Pottorff's home around 10:00 a.m. the same day. Pottorff invited the officers to look around. An officer noticed a knife laying on the counter in the kitchen and asked Pottorff if it was his. Pottorff replied that he had never seen it and requested the officer to take it. The officer refused.

Officer Stopka took a sexual assault report from N.H. at her home on the same morning. Stopka testified that N.H. had seemed upset and confused and that N.H. had difficulty remembering what had happened.

Stopka testified that N.H. had bruises on her face, neck, and around her eyes, scratches on her arms, and a cut on the webbing of her right index finger. The skin on her wrists appeared to have been "kicked back like maybe something had been tied across or scraped across there." N.H.'s fingernail on her ring finger was broken above the quick.

Officer Stopka received a business card with Cooper's name on it from N.H.'s husband. The husband said that the person named on the card had raped his wife. N.H. told Stopka that she and a girlfriend named Brenda Lake had gone out drinking

at some local bars the night before. Stopka testified that N.H. related the following:

"A. She said that she went to the Revolution West and was sitting at a table with some unknown people, I don't know who they were, she didn't either. Brenda. She was talking about having a motorcycle painted. An individual, Mr. Cooper, told her that he would be interested in painting a motorcycle. She then told me that she drove him to his residence, where he wanted to get a portfolio of some of the work that he had done. She said that she dropped him off and she drove herself back to the Revolution West. He then met her there with his vehicle. And she said while they were in the parking lot, I think they were starting to walk back to the club, is what she told me, and she felt him grab her by the arms and pull her hands behind her. She didn't know if she had been handcuffed or tied, she just felt that her hands had been restrained by, you know, handcuffs or some type of rope or something. She then said that she was beaten and taken into the truck. And I believe she blacked out, is what she told me. On the way back to the residence, she woke up. Mr. Cooper wanted her to perform oral sex and she refused, and she was hit a few times. Back at the residence, she was taken out of the truck, drug across the yard and into the residence. Once inside the residence, she would black out occasionally from being beaten, and when she would wake up, she would be either having her—being raped vaginally or anally. And at one point, she woke up, she was getting a tattoo on her right buttocks. And at approximately about three o'clock, she said she woke up, there wasn't anybody in the residence that she saw. She went outside, found her vehicle, and drove home."

According to Stopka, N.H. also indicated that Cooper had tattooed her against her will and that he had threatened to kill her with a knife.

Police officers took N.H.'s panties and the undershirt that she had been wearing from her truck. A partial retrieval of evidence for the KBI rape kit was performed on N.H. by a registered nurse at St. Francis Hospital. The nurse testified concerning the bruises and abrasions on N.H.'s body. The nurse also stated that she had been in contact with many victims of sexual assault and that N.H.'s behavior was consistent with behavior she previously had observed.

The doctor who treated N.H. in the emergency room described her bruises. The color indicated that the bruises had occurred within the past 24 hours. The doctor stated that N.H. had part of a new tattoo on her right buttock which appeared to be the major source of her pain. A bruise on N.H.'s inner right thigh

was noted. The doctor discovered a new tampon that had been inserted that morning as well as another that had been forced deep into N.H.'s vagina. The doctor testified that: (1) N.H.'s speech was slurred, (2) her breath smelled of alcohol, (3) she said that she may have passed out from drinking too much alcohol, and (4) there was no physical sign of injury to the vagina or rectum. The tests collected for the rape kit failed to reveal any spermatozoa or seminal material.

Pottorff testified that he had seen Cooper at Frankie's Lounge around midnight and that at about 2:00 a.m. he had invited Cooper and others over to his house to have a drink. Pottorff told the police that his friend Rick and a couple of girls had been drinking at the bar and at his house. He testified that N.H. went into the bathroom and came out wrapped in a bed sheet. He stated that she then laid on the living room floor for the tattoo. Pottorff recalled that one of the women was named Lake. He stated that he was sick, vomited, and then went to bed.

The Wichita police visited Pottorff's house a third time in order to obtain crime scene evidence. Officer Hiser obtained a waiver to search the house and discovered a pair of women's panties just inside the kitchen door. Detective Fullerton, a crime scene investigator for the Wichita police, took photographs of N.H.'s injuries. These photos were admitted into evidence. Detective Fullerton also collected a broken fingernail from the living room floor at Pottorff's house. He discovered a sheet, white blouse, jeans, and a white bra.

At trial, N.H. testified that she met her friend Lake at a club called Vappers. N.H. had two or three beers and then left in her pickup truck with Lake. They arrived at Revolution West around 8:00 p.m. where they met N.H.'s husband and a couple of friends. Cooper was displaying his tattoo book. N.H. looked at the book because she wanted another tattoo. N.H. and Cooper agreed that he would tattoo her later in the evening.

Around midnight, after an evening of "bar hopping," N.H. left with Lake and followed Cooper to Pottorff's house. The group at the house included N.H., Lake, Cooper, Pottorff, and another couple. Pottorff fixed everyone a drink. Sometime that evening N.H. and Lake took Cooper to his house to pick up his tattoo equipment. N.H. testified that she went to the bathroom to put

a sheet around her so she could have her buttock tattooed. N.H. then laid face down on the floor. Cooper started giving her the tattoo.

N.H. stated that Lake and the other couple left at some point in the evening. Pottorff was drunk, sick, and passed out in his bedroom. According to N.H., after everyone else had left, Cooper removed the sheet and told her that he was going to rape her. He did not use the word "rape" but rather told her that if she would let him "do it" he would let her go. N.H. said that she and Cooper struggled as he beat her. The struggle moved into the kitchen where the two "slugged" each other. N.H. testified that her hands were restrained at some point but that she was eventually able to free them. Next, Cooper pushed N.H. into a refrigerator and something fell, hitting her in the head and knocking her out. N.H. awoke face-up on the floor with Cooper, naked, on her stomach. She stated that Cooper "was wanting me to suck on him." N.H. tried to claw him with her fingernails. Cooper hit her in the chest. He then choked her and poured peach schnapps down her throat. She said that she could not breathe and, consequently, passed out.

According to N.H., the next thing she remembered was Cooper telling her that if she would "let him do it" he would let her go. She was now laying face down with Cooper on her back. She indicated that they struggled again and that Cooper had vaginal and anal intercourse with her before he knocked her out. Cooper had not ejaculated and she did not know whether he had an erection.

N.H. testified that when she woke up the house was quiet. She did not see anyone. The next thing she knew she was at home. She did not remember "much of anything" that occurred that morning, including her interview with Officer Stopka. She did remember that her watch and earrings were missing. At trial, N.H. indicated that she was wearing the watch she had retrieved from police property. She explained that the watch clasp had broken when the watch was ripped off her wrist.

At trial, Lake testified that she met N.H. at Devil's Den. They moved on to Revolution West, where they saw N.H's husband and met Cooper. According to Lake, Cooper drove them to another club. The three returned to Revolution West. N.H. and

Lake moved on to Frankie's Club where they again saw Cooper. They then went to Pottorff's house, where N.H. made arrangements for the tattoo. Lake testified that N.H. entered the bathroom, put a sheet around herself, and returned to the living room where Cooper started giving her the tattoo. Lake stayed at Pottorff's house until four or five a.m., when she left to prepare for work. She called the police because she was concerned for N.H.'s safety.

N.H.'s husband testified that he remembered meeting Cooper at Revolution West. He said he went home around 9:00 p.m. He stated that he became worried when N.H. was not home the next morning. He called home until he reached her. She was "real upset and crying."

Cooper did not testify at trial. Defense counsel objected to the admission of two pieces of evidence which are relevant to the issues on appeal: a knife and a tattoo book. Defense counsel neither objected to the proposed instructions nor requested additional ones.

### The Sufficiency of the Evidence

The State, to sustain a rape conviction under K.S.A. 21-3502, must prove that (1) Cooper had sexual intercourse with N.H. and (2) sexual intercourse was committed without the consent of N.H. when she was overcome by force or fear.

Cooper asserts that the State's case is based upon the uncorroborated and inconsistent testimony of N.H., the victim. Consequently, he relies on *State v. Matlock*, 233 Kan. 1, 3-4, 660 P.2d 945 (1983) (conviction of rape reversed because no rational factfinder could have believed the uncorroborated testimony of the prosecutrix).

Cooper applies the *Matlock* rationale to the facts in the case at bar and concludes that sexual intercourse between Cooper and N.H. was not proved beyond a reasonable doubt. Cooper focuses upon the medical testimony discussed above and observes that: "The only other evidence was the testimony of N.H., who gave two stories of the events leading up to the sexual assault which were totally contradictory."

Cooper also takes issue with the element of the crime of rape which requires the victim to be overcome by force or fear. He states:

"Despite N.H.'s claim that she vigorously resisted Mr. Cooper's alleged sexual assault, there was no medical evidence of an injury to her vaginal or anal openings which would be indicative of nonconsensual intercourse. Likewise, while N.H. claimed she was first knocked unconscious when something fell off the refrigerator and hit her on the head, no lumps or serious bruises were found on N.H.'s head, and no heavy objects were found on the kitchen floor. While N.H. allegedly sustained scratches and bruises and a broken fingernail, it is a difficult inference to make that after hours of struggle to save one's life and honor only such minor injuries would be inflicted."

Cooper urges us to follow the *Matlock* path and reverse the conviction. The State contends: "[A]lthough N.H.'s testimony was somewhat inconsistent with what she told police immediately after the rape, she was distraught and incoherent. At the time of trial, N.H. had no recollection of the morning following the rape." Additionally, the State argues that testimonial inconsistencies are to be weighed by the jury, not by this court. The State reasons that the victim in *Matlock* (the defendant's stepdaughter) did not file a complaint until 15 months after the alleged rape occurred. The prosecutor's case in *Matlock* consisted solely of the victim's testimony. Consequently, the State argues, in the case at bar, that *Matlock* is distinguishable. We agree. N.H.'s testimony was corroborated by physical evidence, witness testimony, and Cooper's own statements.

The evidence, when interpreted in the light most favorable to the prosecution, supports the conclusion that a rational factfinder could have found Cooper guilty beyond a reasonable doubt. The common-law rule that testimony of the prosecutrix alone can be sufficient to sustain a rape conviction without further corroboration as long as the evidence is clear and convincing and is not so incredible and improbable as to defy belief has not been modified. See *Matlock*, 233 Kan. at 3. The function of weighing the evidence and passing on credibility belongs to the jury, not to us. A verdict secured on substantial competent evidence will not be disturbed on appellate review. *State v. Holt*, 221 Kan. 696, 700-01, 561 P.2d 435 (1977).

*Matlock* does not control the case at bar.

### The Knife and the Tattoo Book

Cooper relies on K.S.A. 60-445 (a judge may exclude evidence

if the probative value is substantially outweighed by the risk that admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered).

Relevancy and materiality are matters within the sound discretion of the trial court. We will not disturb an evidentiary ruling unless there is a clear showing of abuse of discretion. *State v. Abu-Isba,* 235 Kan. 851, 857-58, 685 P.2d 856 (1984). Cooper carries the abuse of discretion burden. Discretion is abused only where no reasonable person would take the view adopted by the trial court. *State v. Heywood,* 245 Kan. 615, 621, 783 P.2d 890 (1989).

When a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, the object should be admitted for such weight and effect as the jury sees fit to give it, unless it is clearly irrelevant. *State v. Ji,* 251 Kan. 3, 15, 832 P.2d 1176 (1992). Cooper argues that the jury was prejudiced by the admission of the knife found at Pottorff's house. According to Cooper, the knife created a presumption that it was in his possession while the alleged rape occurred. Cooper reasons that the knife lacked probative value because it had never been linked to him by any eyewitness or by scientific evidence. Therefore, he asserts, its admission resulted in jury prejudice and reversible error.

N.H. had told the police the morning after the alleged rape that Cooper had threatened to kill her and that he had a knife. The knife did not belong to Pottorff. (He did not know to whom it belonged.)

The State argues that the knife was relevant to the element of rape which requires the victim to have been overcome by force or fear. At trial, the following exchange took place:

"[Defense Counsel]: Your Honor, I don't see the relevance [of admitting the knife]. It's not at all—I mean, in [N.H.'s] testimony she mentioned nothing about it, and I think it's just another exhibit which basically says nothing about the case and it's not relevant. It should not be admitted.

"[Prosecutor]: Your Honor, I believe Officer Stopka testified yesterday that in his conversation with Brenda Lake she had been threatened and there was a knife involved. This knife was found at the scene of the alleged assault, and it was not identified by the owner of the property; therefore, I think it is relevant.

"[Defense Counsel]: Also add, Your Honor, that the knife has not been linked to Mr. Cooper in any respect.

"THE COURT: I will admit it. Objection overruled."

The characterization of the trial objection advanced by Cooper on appeal is incorrect. Cooper asserts that "[d]efense counsel objected because the admission of the knife would cause prejudice which out weighed any probative value." The objection at trial only concerned the relevance of the knife. The specific grounds for an objection must be given at trial to preserve an issue for appeal. K.S.A. 60-404. The court did not have an opportunity to rule on the question of prejudice. The knife was relevant. We find no abuse of discretion in admitting the knife.

Cooper claims that the admission of the tattoo drawing book prejudiced the jury. He contends the book was prejudicial because it showed samples of drawings of nude women, Nazi symbols, and satanic-type figures. He argues that the tattoo book had no evidentiary value to prove or disprove that the crime of rape had been committed by Cooper. The State counters by observing that Cooper objected to the book's admission at trial based on relevance, not on prejudice. At trial, Cooper never claimed the book was prejudicial because some of the designs were violent or sexually explicit.

The tattoo book, the State contends, was not offered to prove Cooper raped N.H. In fact, the State argues, the tattoo book was relevant because it corroborated the testimony of N.H., Lake, and N.H's husband regarding the events on the evening in question. We agree.

Based upon the objection at trial, the tattoo book admission issue is not properly before us on appeal. However, our discussion of the issue indicates Cooper has not shown abuse of discretion.

### Involuntary Intoxication Instruction

K.S.A. 21-3208 states:

"(1) The fact that a person charged with a crime was in an intoxicated condition at the time the alleged crime was committed is a defense only if such condition was involuntary produced and rendered such person substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law."

Cooper emphasizes that Officer Novacek stated that Cooper claimed to have drunk a six-pack of beer and that Cooper felt

like *"someone had put something in his beer, perhaps a barbiturate or something, because he doesn't remember beer affecting him that way."* (Emphasis added.) Cooper contends that evidence that he may have unknowingly been drugged by another person is precisely the type of conduct which constitutes involuntary intoxication. See *State v. Palacio,* 221 Kan. 394, 559 P.2d 804 (1977).

Cooper did not request an involuntary intoxication instruction. The issue before us is whether the failure to give the instruction was clearly erroneous. He argues that clear error occurred. Cooper observes that it is plausible in light of his unusual conduct in calling the police that the jury may have concluded he was not capable of forming the general intent necessary to commit rape.

The State contends that the trial court had no duty to instruct on involuntary intoxication. "In a criminal action, a trial court must instruct the jury on the law applicable to the theories of all parties where there is supporting evidence." *State v. Hunter,* 241 Kan. 629, 644, 740 P.2d 559 (1987).

Cooper's "morning after" surmise that *"someone had put something in his beer, perhaps a barbiturate,"* is not sufficient to support his newly asserted theory on appeal that his intoxication was involuntary. The evidence was overwhelming that Cooper reeked of alcohol the morning following the encounter with N.H. Cooper had been drinking alcohol all the previous evening. Before intoxication may be said to be "involuntary" a defendant must show an irresistible force, which is something much more than a strong urge or "compulsion" to drink. *State v. Lilley,* 231 Kan. 694, 697, 647 P.2d 1323 (1982). There was no proof that Cooper was compelled to drink by an irresistible force. The involuntary intoxication argument is only supported by the conjecture Cooper advances on appeal. Cooper has not provided a persuasive argument that the jury would have returned a different verdict had the instruction been given. The trial court's failure to so instruct the jury was not clearly erroneous.

Affirmed.