No. 79,172

STATE OF KANSAS, *Appellee*, v. CHARLES BROWN, *Appellant*.

(973 P.2d 773)

Opinion filed January 22, 1999.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with him on the brief for appellant.

*Matthew J. Bock*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Charles Brown appeals his jury conviction of first-degree murder, K.S.A. 21-3401, and subsequent sentence to a term of life imprisonment with a 25-year parole eligibility term.

Brown alleges nine separate errors, including: (1) denial of a motion for change of judge, (2) violation of his speedy trial right, (3) violation of a motion for a transcript of the preliminary hearing, (4) admission of bone and teeth fragments, (5) allowing expert testimony of a volunteer for a search and rescue canine organization, (6) denial of his request for services of an investigator, (7) limitation of cross-examination, (8) ineffective assistance of counsel, and (9) cumulative error. We do not find any of Brown's alleged errors sufficient to require reversal of his conviction and sentence.

*Factual statement*

Although the body of the victim, Michael Gerhard, was not found, the case against Brown was based on the testimony of one of Brown's employees, Shawn Cordray; Brown's former girlfriend, Glenda Sands; a jailhouse companion of Brown's, Shannon Cooper; and circumstantial evidence including an expert opinion of a canine search and rescue individual and admission of bone and teeth fragments located where the alleged cremation of the body took place.

Brown denied the crime, said it was committed by Cordray, stated his former girlfriend was out to get him, contended his cell mate made up his testimony to attempt to obtain reduction of charges against him, and the evidence was insufficient to prove his guilt beyond a reasonable doubt. Highly summarized, the testimony of the principal witnesses are as follows:

Shawn Cordray

Cordray worked for Brown at the salvage yard he owned. A house on the property was used for storage and to house Brown's pets. On October 31, 1995, the house burned and the pets were killed in the fire. Brown was angry. After being told there was a strong odor of gasoline and that it appeared to be an arson fire, Brown said that "if he found out who did it, that he was going to kill them." Cordray said Brown asked him to stay in a camper at the salvage yard to look after the property.

Cordray testified Brown thought Gerhard had burned down the house because Gerhard had called the night of the fire. Gerhard did not work at the salvage yard but occasionally visited to "pick up different things." A week after the fire, Gerhard arrived at the salvage yard in his van and spent the night in the camper with Cordray. Around 10 the next morning, Cordray testified that "Charlie came up to Mike and said he had to talk to him and they went to the camper." Cordray said he was approximately 25 feet away from the camper and could hear muffled yelling for a few minutes and then quiet. Cordray testified Brown led him inside the trailer where he saw Gerhard inside the bathroom "crunched on his calves" with a trickle of blood under his nose. His face was pale, his lips were blue, and there were marks on his neck.

Cordray testified Brown said he had killed Gerhard because he had burned down his house. Cordray was directed to wrap Gerhard's body in plastic and place it on a burn pile located behind the trailer. Cordray said he assisted Brown in placing big logs and gas and diesel fuel on the pile, then added more wood and more diesel fuel and Brown ignited it. Cordray testified he and Brown kept the fire burning through the rest of the day and the following morning when Brown directed him to "rake up the ashes, make sure there's no bones in there."

Cordray said his brother, David Cordray, who also worked for Brown, came to the salvage yard on the day of the burning, but he did not tell his brother what had happened because he did not want to put him in danger.

Cordray testified Brown told him to tell anyone who asked that Gerhard went back to Iowa because he missed a "court thing up there." When asked why he helped, Cordray said: "I was scared" and if he told anyone about Gerhard's death, Brown would hurt him and his family.

Cordray stated Brown took possession of some of Gerhard's property, which was sold at a flea market. Gerhard's van was sold to David Cordray for $300. Some of Gerhard's tools were sold in January 1996 to David Servais. Gerhard's name was etched on the tools, and Servais contacted the police and surrendered the tools after reading about Gerhard's disappearance in the newspaper.

Cordray said he quit working for Brown in January 1996, and contacted the police through a friend of his mother's. Cordray testified he was present when the police executed a search warrant on the salvage yard. He pointed out the mound of earth and ashes located under a cardboard box where the fire had taken place. Search dogs trained to detect the scent of human remains were brought to the scene and alerted on the location identified by Cordray.

## Glenda Sands

Glenda Sands, who had been Brown's girlfriend and business partner, testified Brown told her he believed Gerhard had started the fire to cover up his thefts from him. She asked why Gerhard's

van was on the property and was told by Brown that Gerhard had "left and was angry and walked away." However, she further stated that in December 1995, Brown wrote a note to her which stated he had strangled Gerhard and burned his body. The note was written because Brown believed his house was bugged. Sands stated Brown told her if she told anyone he would kill her and bomb her parent's house. The note was burned in the kitchen sink. Eventually, Brown and Sands broke up, and she made her story known to the police.

The evidence showed that after Cordray and Sands gave their statements to the police and the search of the salvage yard was completed, Brown was not at his residence when the police arrived to take him into custody. Brown was found in some brush wearing only his jeans.

Shannon Cooper

Shannon Cooper, an inmate in the Wyandotte County Jail, met Brown while in custody. Cooper testified he asked Brown what he was in for and Brown told him "he had killed a man named Michael Gerhard." Cooper testified Brown related the strangling of Gerhard by wrapping a cord around his neck in the bathroom. Brown said an employee named Cordray helped him wrap the body in plastic and place it on a burn pile and, after being burned a day, it was buried in a hole with a Model T car placed over the burial site. Cooper testified Brown told him he killed Gerhard because he had stolen some drugs and burned down a house on the property. Brown offered Cooper $500 up front and $2,000 after he was acquitted to testify that Cordray had committed the murder. Cooper also stated that Brown told him he was afraid that Shawn Cordray would go to the police, so he enlisted the help of David Cordray to dig up the remains of the body and dump it into the river.

Cooper went to his attorney with this information and struck a deal with the prosecution: In return for his testimony, the forgery charges against him would be dismissed and his probation would not be revoked.

Anthony Serrano

Gerhard's landlord, Anthony Serrano, testified there was no indication Gerhard was at his residence during the month of Novem-

ber. By January most of his possessions were gone. Only Gerhard's dog and Harley Davidson motorcycle were still on the premises. These items were stated to be Gerhard's prized possessions and if he left he would have taken them with him.

### David Cordray

David Cordray testified that Gerhard's van was at the salvage yard. He had asked the defendant where Gerhard was and was told that Gerhard "got whacked out on crank" and wandered off.

### Irene Korotev

Irene Korotev testified she and her dog Tino along with another handler and his dog were asked to assist in a search at the salvage yard for a human body. Tino is trained to detect the scent of human remains and she is trained to interpret her dog's behavior. She was only told there was a possibility of human remains; however, Tino "alerted" on a mound of soil and ashes beneath a large cardboard box.

Testimony was presented that the police contacted the street department who removed a section of earth surrounding the area indicated by Cordray as the burn site. The removed dirt was transported to a sanitation department, where it was examined by an anthropologist from the University of Kansas and human bones and teeth fragments, that appeared to be heavily burned, were discovered.

### Charles Brown

Brown took the stand and contended the night of the fire he was at home with Sands. After Gerhard informed them of the fire, he suspected several individuals including Gerhard. Brown testified Gerhard discovered a gas can in a clothes dryer and from then on, Gerhard was no longer a suspect. Brown testified that on November 5 when he went to the salvage yard, Shawn Cordray was already there and a fire was burning, with something in the fire that looked like rib bones. Brown contended he asked Cordray about it but Cordray said Brown did not know what he was talking about. He did not pursue the matter further because he was already in trouble

with the city due to some code violations related to the salvage yard.

Brown testified Sands told him Gerhard's landlord wanted the property removed but that the items taken actually were his which Gerhard had stolen or borrowed from him. Brown further testified that he received the keys to Gerhard's van from Cordray, who said he had fought with Gerhard, who was "high" and had wandered off. He further testified that Cordray confessed he had killed Gerhard and burned his body in a fire, a fact he had passed on to Sands. Brown denied all of the State's evidence. He testified he and Sands had a falling out when he discovered she was having an affair. Sands told him she would find a way to put him in jail. He admitted hiding when the police came to arrest him, but explained that he did so because he was never able to find out what the charge against him was. He acknowledged meeting Cooper in jail but contended Sands had known Cooper first. He denied telling Cooper anything about killing Gerhard, that Cooper had called Sands from jail, and that Cooper had a newspaper article from which he obtained the facts of the case.

### Kathy Creason

Kathy Creason testified for the defense. She was engaged to marry Brown's brother. She testified that she went to the trailer at the salvage yard to repay money Cordray had loaned her. When she opened the door to the trailer, "Shawn was standing there with a propane torch turned on full blast and stuck it in my face and told me that I shouldn't fuck with him because he was going to kill me just like he did Mike and I should know better." Creason testified Sands asked her to help her think of a way to get Brown out of her life. Creason also admitted to being a drug addict but said that she had entered a drug rehabilitation program on December 26, 1995.

### Faith Spruill

Faith Spruill was a inmate who knew all of the parties. She testified she saw Gerhard at the salvage yard several weeks after the alleged murder. She testified Cordray had told her he hated Ger-

hard and that he had gotten into a fight with him in which Gerhard hurt his back.

## Johnny Hogue

Johnny Hogue, another inmate, testified he knew both Brown and Cooper. Hogue testified that shortly before Brown's trial, Cooper told him he was testifying. Hogue said Cooper stated, "I made a deal with Glenda. I'm going to hang his ass." On cross-examination, Hogue denied making up his testimony and denied that Brown had promised him anything for his testimony, although he did admit to speaking with Brown while in jail.

After being properly instructed, Brown was convicted by the jury of first-degree murder and sentenced to life imprisonment with no chance of parole for 25 years.

*Analysis*

*The trial court did not err in denying Brown's motion for a change of judge.*

The standard of review of an error relating to a motion for change of judge is set forth in *State v. Alderson*, 260 Kan. 445, Syl. ¶ 2, 922 P.2d 435 (1996), as follows:

"When a district court refuses to recuse itself from a trial upon the defendant's request, this court has promulgated a two-part test to determine whether the defendant received a fair trial or whether the defendant's due process rights were violated: (1) Did the trial court judge have a duty to recuse himself or herself from this case because the judge was biased, prejudicial, or partial? (2) If the judge did have a duty to recuse and failed to do so, is there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?"

The motion for change of judge was filed on August 16, 1996, pursuant to K.S.A. 20-311d(c)(5). After a hearing on August 23, 1996, the judge advised defense counsel to further comply with the statute. Six documents in support of the motion were filed: three were affidavits from Brown and two from other parties plus a statement filed by defense counsel, which was not sworn to or notarized. All documents alleged a strong animosity between the trial judge and the defense counsel. The sufficiency of the affidavits were denied by the trial judge in a journal entry dated August 23,

1996. The motion and affidavits were reviewed by the administrative judge by an order dated September 3, 1996, which found the motion insufficient and denied.

On appeal, Brown contends (1) the judge held a personal bias and prejudice against his attorney which would make a fair trial impossible, (2) another judge should have been assigned, and (3) he was denied his constitutional right of a fair and impartial court. None of these contentions have any merit.

The State first argues that Brown's motion for change of judge was not timely because of K.S.A. 20-311f. *State v. Timmons*, 218 Kan. 741, 749, 545 P.2d 358 (1976), construes that statute and holds a motion for change of judge must be filed within 7 days after pretrial or receiving notice of the name of the judge before the case is heard, whichever is later. The record clearly reflects that Brown and his attorney would have known by late April 1996 which trial judge was assigned this case. The motion was not filed until August 16, 1996, some 70 days after the hearing on the motion for a continuance, 60 days from the time the trial date was set, and 127 days after the pretrial conference was held. The motion was not timely filed.

The State's argument is valid, and the failure to file within the statutory time period bars the issue on appeal. See *Carpenter v. State*, 223 Kan. 523, 575 P.2d 26 (1978) (holding that failure to timely comply with the statute bars consideration of an affidavit of prejudice).

In addition, the affidavits of the two nonparties are not to be considered. The contentions of Brown were conclusory and not sufficient. Brown's counsel's statement was not prepared in affidavit form or properly executed under the statute. The record reflects the administrative judge of the judicial district did consider the motions, reviewed all of the documents, and properly denied the motion. This contention is without merit.

*Brown's right to a speedy trial was not violated when the trial court granted the State's motion for continuance in order to send bone and teeth fragments to the FBI laboratory for DNA testing.*

While the matter of a continuance in a criminal case is within the discretion of the trial court, *State v. Stallings*, 262 Kan. 721,

726, 942 P.2d 11 (1997), the statutory speedy trial requirements of K.S.A. 22-3402 require that an accused in custody (as Brown was) must be brought to trial within 90 days after arraignment unless the delay was the application or fault of the defendant or from a continuance ordered under subsection (3).

K.S.A. 22-3402(3) allows the 90-day limitation to be extended if material evidence is unavailable and there are grounds to believe that it can be obtained within the succeeding 90 days. This provision allows only one such continuance unless for good cause shown and the trial is to be commenced within 120 days of the original trial date.

In this matter, Brown was arraigned on March 22, 1996, and the case set for trial on June 17, 1996, which was within the 90-day period. As the result of a hearing on June 6, 1996, the trial was continued in order to send bone and teeth fragments to the FBI laboratory for PCR DNA testing.

The argument at the hearing on the motion to continue was based on the assurance of an FBI agent who believed testing would obtain results from a very small amount of DNA, such as was submitted in this case. After the motion was granted, the trial commenced on September 3, 1996, which was 89 days after the hearing.

Brown makes two arguments. First, that the test contemplated was not reliable and generally accepted within the scientific community and, thus, failed the test of *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923). Second, Brown contends the continuance was based upon false information because dental records were expected to be obtained but ultimately could not be located. This was contended by Brown to be false information and analogous to situations where false information is used to obtain a search warrant that is suppressed.

Neither contention has any merit. The evidence attempted to be obtained under K.S.A. 22-3402(3)(c) was material. This did not change when the testing or lack of it did not result in admissible evidence. See *State v. Green*, 254 Kan. 669, 674, 867 P.2d 366 (1994) (continuance proper even though State did not introduce DNA evidence). The State is not required to show that the evi-

dence meets the *Frye* test before its requested continuance can be granted. It is entitled to attempt to match the bones and teeth fragments found at the crime scene to the victim's DNA. The continuance was properly granted. The speedy trial right was not violated.

*The trial court did not err in denying Brown's motion for a transcript of the preliminary examination.*

This is again an abuse of discretion issue and one that is without merit. Brown's request for a transcript of the preliminary hearing was denied, but an audio tape of the preliminary hearing was made available. In this situation, trial counsel indicated that a copy of the tape would be sufficient, but continued to contend that K.S.A. 22-4509 was violated.

In *State v. Kelley*, 209 Kan. 699, 702-03, 498 P.2d 87 (1972), we held that the requirement of availability of a record or transcript of a prior proceeding required by *Britt v. North Carolina*, 404 U.S. 226, 30 L. Ed. 2d 400, 92 S. Ct. 431 (1971), could be satisfied by alternative means. It is clear that Brown's counsel had sufficient access to the preliminary hearing testimony so that he was able to provide an adequate defense. The trial court did not err in denying Brown's request.

*The trial court did not abuse its discretion in allowing the State to admit bone and teeth fragments found at the murder scene.*

Brown's argument that admission of teeth and bone fragments found at the murder scene were irrelevant because they were not directly related to Gerhard is not tenable. Relevancy issues are within the sound discretion of the trial court. *State v. Cooper*, 252 Kan. 340, 348, 845 P.2d 631 (1993). The evidence showed the location of the area where Cordray testified that Gerhard's body had been cremated, dogs had alerted to the area, and fragments recovered were identified by Dr. Frayer, an anthropologist, as human bone and teeth fragments.

When Dr. Frayer testified at trial, he identified the bones and teeth fragments recovered were that of an adult human being, but he could not make a more specific identification. Defense counsel

objected on the grounds of relevancy and lack of foundation. The trial court overruled after a foundation was shown by the police sergeant who testified as to the method of collection.

The fragments were clearly relevant because they added to the circumstances of the crime. This situation is similar to *Cooper*, where a knife found at the scene of the crime was admitted, but it was contended on appeal to be irrelevant because it was not linked to the crime by eyewitness or scientific evidence. We held in *Cooper*:

"When a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, the object should be admitted for such weight and effect as the jury sees fit to give it, unless it is clearly irrelevant." 252 Kan. at 348.

The ruling in *Cooper* is applicable here. The bone and teeth fragments were properly admitted as was the knife in *Cooper*. A contention on appeal that the bone and teeth fragments were more prejudicial than probative was not the basis for the objection below. This argument was not preserved for appeal. There was no abuse of discretion in admitting the bone and teeth fragments.

*The trial court did not abuse its discretion in allowing a volunteer for the search and rescue canine organization to testify as to her opinion that human remains were alerted to by her trained dog.*

At trial, Irene Korotev testified she has been part of the Missouri Search and Rescue Canine organization since 1984. She has received extensive training including several search and rescue schools. She has worked with Andrew Redmon, a recognized expert in the field of locating human remains using canines. Korotev is nationally certified as search ready. Her dog, Tino, is trained to ignore all scents other than human beings. Korotev and Tino have been on approximately 20 searches of this type and have previously been successful in finding human remains.

With this background, Korotev was allowed to give her opinion that based upon the dog's behavior, a conclusion could be drawn that the remains of a human body were in the area. Defense counsel objected for failing to lay an adequate foundation and asked to voir dire the witness before she was allowed to give her opinion.

The court ruled an adequate foundation had been laid and that defendant would be allowed to cross-examine the witness.

On appeal, Brown argues Korotev was not qualified to render an opinion because she did not have sufficient medical training. Additionally, Brown contends it was prejudicial not to be allowed to voir dire the witness before an opinion was given.

The State contends the witness was fully qualified and an adequate foundation was established. The admission of bloodhound tracking evidence and narcotics dogs are analogous to the issues in this case, and those requirements should be followed. The State relies on *State v. Wainwright*, 18 Kan. App. 2d 449, 856 P.2d 163 (1993), and the cases cited therein for its contention.

In *Wainwright*, the history of allowing bloodhound evidence through *State v. Netherton*, 133 Kan. 685, 690-91, 3 P.2d 495 (1931), *State v. Fixley*, 118 Kan. 1, Syl. ¶¶ 1, 2, 233 Pac. 796 (1925), and *State v. Adams*, 85 Kan. 435, Syl. ¶ 3, 116 Pac. 608 (1911), was stated. The Court of Appeals said: "Here, there was sufficient foundation laid to show both the training and reliability of the dog and the trainer to allow the admission of the bloodhound evidence." 18 Kan. App. 2d at 452. This is also true in this case. Korotev was qualified to testify as to her training and qualifications, her dog's training, and to interpret her dog's action. The opinion was not allowed as to whether it was the victim's scent nor was it the only proof offered by the State. The State also offered testimony of Cordray and Dr. Frayer, and other evidence. This was a circumstantial evidence case in which this evidence was entitled to be considered for the weight that the jury might decide to give it. It was not erroneously admitted, nor was Brown's counsel prevented from adequately cross-examining and discrediting the witnesses' testimony. See also *State v. Barker*, 252 Kan. 949, Syl. ¶ 6, 850 P.2d 885 (1993). ("In order to establish probable cause for the search of a vehicle based on a canine sniff, some foundation testimony is necessary to establish that the 'alert' of the dog provided probable cause. A description of the dog's conduct, training, and experience by a knowledgeable person who can interpret the conduct as signaling the presence of a controlled substance would constitute the minimum requirement for finding probable cause.")

*The trial court did not improperly refuse to grant defense counsel's motion for the services of an investigator.*

The authorization for investigative services in a criminal trial of an indigent defendant is a matter which lies within the sound discretion of the trial court whose decision will not be disturbed unless prejudice can be shown. *State v. Reynolds,* 230 Kan. 532, 535, 639 P.2d 461 (1982).

Defense counsel filed a pretrial motion requesting the services of an investigator to determine the possibility that Shawn Cordray has killed other people and did kill the victim of this crime. During a hearing on the motion, defense counsel contended that these services were required to assist in discrediting the principal witness against Brown.

In denying the motion, the trial court held that evidence of whether Cordray had admitted to killing or even could be shown to have killed other people would not be admissible in the trial, although evidence that Cordray killed the victim would be admissible.

At trial, defense counsel questioned Creason as to admissions of Cordray concerning Gerhard's death but was not allowed to question her concerning other matters.

Brown's contention that he was unable to prepare an adequate defense because he was denied the services of an investigator is claimed to be similar to *Dunn v. Roberts,* 963 F.2d 308, 314 (10th Cir. 1992), where an accused's mental condition was an issue, and she was deemed required to be granted funds for exploring her psychiatric condition.

The State concedes that an indigent defendant may be furnished with investigative services if the requirements set forth in K.S.A. 22-4508 are met, but that this right is not absolute. The State relies on *State v. Frideaux,* 207 Kan. 790, 792, 487 P.2d 541 (1971), where a defendant's request to hire an investigator in an attempt to find a phantom witness was denied.

K.S.A. 22-4508 allows services of an investigator where deemed necessary and the defendant is financially unable to provide them. However, in this case, even if other crimes by Cordray were proven, they would not have been admissible under K.S.A. 60-447.

Brown's argument that the investigator would have determined that other individuals had killed Gerhard is strictly speculation. The trial court did not abuse its discretion in making this determination and in its refusal to grant the request for investigative services.

*Did the trial court improperly refuse to allow defense counsel's questioning of Creason regarding Cordray's alleged statements that he had killed other persons?*

The admission or exclusion of evidence is left to the sound discretion of the trial court. *State v. Roberts*, 261 Kan. 320, 328, 931 P.2d 683 (1997). Evidence of specific instances of conduct other than criminal convictions which tends to prove a bad character trait is inadmissible. K.S.A. 60-447.

Brown makes a somewhat multiplicious argument that the defense counsel was not allowed to sufficiently question Cordray or Creason regarding Cordray's statements that he allegedly admitted to killing persons other than Gerhard. The evidence of specific acts are irrelevant and inadmissible as discussed in the previous issue. It was not an abuse of discretion in refusing to allow this line of testimony.

*Was Brown denied the right to effective assistance of counsel?*

After conviction, Brown filed a pro se motion for a new trial, alleging ineffective assistance of counsel. Brown claimed attorney Albin was not competent because he had not handled a murder case previously, that names and addresses of witnesses had been provided but not interviewed, that Albin had stated he would represent Cordray after he obtained Brown's exoneration, and that available evidence was not used to impeach perjured testimony.

Albin responded by filing an affidavit showing he had handled 15 prior jury trials, interviewed all witnesses for this trial, met with Brown's neighbors, done extensive interviews with Cordray, and while he did say he would represent Cordray once he "got Charles off," it was because he expected a defense verdict and that Cordray would then be charged.

At a hearing on the motion, Brown was granted new counsel, and he was given the right to call additional witnesses but did not

do so. The judge hearing the motion also presided at the trial and ruled that Brown's right to a fair and impartial trial was not violated and he had received adequate representation.

On appeal, Brown now contends he did not receive an evidentiary hearing and has asked this court to remand for such a hearing. In the alternative, Brown asks the court to decline to rule on this issue so that he could raise the matter in a later motion.

Brown asserts that each allegation is supported by facts in the record and required an in-depth analysis, which was not provided at the time the motion for a new trial was considered.

The State contends that Brown had the opportunity to present evidence and even with a different counsel did not do so. This it is claimed, in effect, waives the hearing, relying on *State v. Walker*, 239 Kan. 635, 638, 722 P.2d 556 (1986).

We decline to remand this matter for determination. The matter was before the trial court. The opportunity for presentation of additional evidence existed. The trial court properly denied the motion.

Under our obligation, we review the issue on appeal de novo as directed by *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), as mixed questions of fact and law under the totality of the facts and circumstances. See *State v. Rice*, 261 Kan. 567, 602, 932 P.2d 981 (1997).

In *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985), our standards for considering a claim of ineffective assistance of counsel are set forth as follows:

"The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 236 Kan. 650, Syl. ¶ 2.

We have adopted the two-pronged test of *Strickland:*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

"(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the effectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

"(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 236 Kan. 650, Syl. ¶ 3.

The trial court's ruling that "Mr. Albin's representation of the defendant was certainly adequate pursuant to case law, pursuant to his experience in these types of cases, and pursuant to what this Court was able to observe." We have further stated that much deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened. *Chamberlain*, 236 Kan. at 659-60.

The evidence brought forward by Brown in his pro se motion was not complemented by any additional evidence. No witnesses supported the allegations he made. Nor were any facts in the record argued in support of the allegations. Brown did not submit the names and addresses of the witnesses that he says Albin failed to interview. Brown asserts in his motion that statements of Albin were prejudicial, but he does not offer any evidence to support this assertion.

The strongest argument made by Brown is that Albin's statements concerning Cordray presented a conflict of interest. This relates to Albin's statement in his affidavit that "I do like Shawn. It is true that I said that when I got Charles off, I would represent Shawn because I fully expected him to be charged with the murder that he committed while in a drunken condition."

There is no showing that this statement precluded Albin's ability to examine Cordray, and his belief that Cordray was the killer is

consistent with the trial strategy. Albin's handling of Cordray does not show ineffective assistance of counsel.

Based upon the factual showing before us, the trial court's ruling is correct. Brown has failed to meet either prong of the *Chamberlain* test. The trial court's ruling that effective assistance of counsel existed in this case is affirmed.

*Did cumulative error deprive Brown of a substantially fair trial?*

Brown's final argument that cumulative error exists in this case does not have any merit. Under the totality of the circumstances, the matters raised did not prejudice Brown and deny him a fair trial. There was substantial direct evidence as well as circumstantial evidence to justify and uphold the jury verdict. The contention of cumulative error is without merit. *State v. Lumbrera,* 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

The trial was certainly not perfect, but no party is entitled to one. A review of the record, however, shows that a fair and impartial trial was held.

Affirmed.