NOT DESIGNATED FOR PUBLICATION

No. 123,276

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS JUSTIN FOSTER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed May 6, 2022. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Claire Kebodeaux*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before MALONE, P.J., SCHROEDER and HURST, JJ.


PER CURIAM: Nicholas Justin Foster appeals his convictions of aggravated criminal sodomy, aggravated indecent liberties with a child, and aggravated indecent solicitation of a child. Foster claims (1) there was insufficient evidence to support the convictions, and (2) prosecutorial error in the closing argument denied him a fair trial. After thoroughly reviewing the record, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

S.M., a 12-year-old girl diagnosed with autism, Asperger syndrome, and attention-deficit/hyperactivity disorder, lived with her mother, W.F. (Mother), in Kansas City, Kansas. On April 28, 2019, Foster came to Mother's house and watched television with Mother and S.M. in the basement, described as the basement incident. Mother was sitting on one couch and S.M. and Foster were on the other couch. S.M. was lying down asleep and covered by a blanket. Foster was sitting on the other end of the same couch as S.M. and he covered himself with S.M.'s blanket.

Mother became suspicious of Foster's movements—his hands would go under the blanket and then he would pull them out whenever Mother looked over—so she "got up and surprised him by walking over and just yanking the blanket" off Foster's lap. Foster immediately became defensive saying that nothing happened. Mother saw that S.M.'s "britches w[ere] partially down" exposing her pubic area. Mother did not see Foster touch S.M., but she believed he was fondling her genitals.

Mother immediately woke up S.M. and walked her upstairs to bed. She and Foster then begin to argue. Mother told Foster to get out of her house and she called 911. While waiting for the police to arrive, S.M. told Mother that Foster had touched her genitals before and told her not to tell. S.M. said that Foster told her that "this is what other guys will do to me some day."

After calling the police, Mother also called S.M.'s older half-sister, L.F. (Sister) and S.M.'s case manager, Tonya Briggs. Sister arrived at the house around the same time as the police. Mother explained the situation and Sister went upstairs with S.M. Sister asked S.M. if she could inspect her genitals for irritation and saw none. Officer Katelyn Bills arrived and went upstairs to question S.M. Sister was present for the interview. S.M. denied any sexual abuse and reported that nothing uncomfortable happened.

2

In the days following the basement incident, S.M.'s behavior changed, and she started acting out in school. During one outburst, Briggs, visited her at school and learned about another incident with Foster—the kitchen incident. S.M. reported that on March 17, 2019, the day after Mother's birthday, S.M. came downstairs for breakfast and Foster promised her some of Mother's birthday cake if she would pull down her pants. S.M. reported that she obeyed Foster and that he licked her genitals. Because of S.M.'s disruptive behavior at school, Mother believed S.M. was experiencing a "traumatic" breakdown and sent her to Marillac Hospital for treatment.

After S.M. was released from the hospital, she went to Sunflower House for an interview about the basement incident. She was interviewed by Shannon Bisel, interview specialist. Lead Detective Kevin Wells observed the interview from another room. During the interview, S.M. disclosed information about her and Foster's relationship, including prior sexual abuse. She said the abuse started when she was 10.

On July 18, 2019, the State charged Foster with aggravated criminal sodomy and aggravated indecent solicitation of a child for the kitchen incident on March 17, 2019, and two counts of aggravated indecent liberties with a child—one count for the basement incident on April 28, 2019, and one count for lewd fondling or touching between April 5, 2017, and April 27, 2019. On November 11, 2019, the district court held a preliminary hearing. After hearing testimony from Mother and Wells and reviewing the Sunflower House report, the district court found probable cause to bind Foster over for trial.

The district court held a three-day jury trial beginning February 18, 2020. The State called responding officer Martin Cervantes Jr., as well as Briggs, Sister, Mother, S.M., Bisel, and Wells. The witnesses testified to the above events.

Sister testified that when she was 10 years old and Foster was 15 years old, he walked in on her after using the bathroom, asked her to pull her pants and underwear

3

down and to sit on his exposed penis. Sister said she did, but then got up because it did not feel right. She urinated again, and Foster made her sit down on him again. After the bathroom incident, Sister reported Foster to her father, who called the police. Sister was interviewed by the Sunflower House, submitted to a lie detector test, and was recorded describing these events. Foster was adjudicated as a juvenile for two counts of aggravated indecent liberties with a child. Sister also testified about a time when she was five and Foster had touched her vagina on the outside of her clothes with his hand.

S.M. testified about the basement incident and said she woke up and remembered Foster yelling and Mother telling him to get out of the house. S.M. also testified that Foster touched her "pee-pee" and butt several times when she was "about 10, 11, 12-ish." She said the first time was in her room when he was hugging her. She said at first the touching did not make her uncomfortable, but then it happened more often, and it became uncomfortable. S.M. testified that Foster would reach his hands under her clothes, past her underwear, and rub her vagina with his pointer finger. S.M. said this type of touching happened a lot—more than 10 times—usually when Mother was not around.

S.M. also testified to the kitchen incident that happened on March 17, 2019. She said that Foster offered her a piece of Mother's birthday cake in exchange for letting him lick her genitalia. S.M. said she first declined but relented when he threatened not to give her a dinosaur for her upcoming 12th birthday. S.M. said that was the only time Foster licked her vagina, he used his tongue, and he stopped when she asked him to stop.

Bisel described her training and experience to the jury and discussed the purpose of a forensic interview. She said that the Sunflower House follows the National Children's Advocacy Center forensic interview (NCAC FI) structure which allows for flexibility in thinking and decision-making during the interview. The interviews are conducted in a neutral environment with nonleading, nonsuggestive questions, they are

4

recorded, and observed by investigators. Bisel testified that during the interview, S.M. disclosed information about her and Foster's relationship, including sexual abuse.

Once the State rested its case, Foster moved for a directed verdict based on insufficiency of evidence. The district court denied Foster's motion. Foster did not testify, and the defense put on no evidence. Foster argued in closing that he was innocent and that S.M. was influenced by Mother and others who interviewed her.

The jury convicted Foster on Count I for aggravated criminal sodomy and Count IV for aggravated indecent solicitation of a child for the kitchen incident and Count III for aggravated indecent liberties with a child for an incident that occurred on or between April 5, 2017, and April 27, 2019. The jury acquitted Foster on Count II, the aggravated indecent liberties charge for the basement incident. On April 13, 2020, the district court sentenced Foster to life imprisonment with a mandatory minimum of at least 25 years under Jessica's Law, K.S.A 2019 Supp. 21-6627, and lifetime parole. Foster timely appealed the district court's judgment.

SUFFICIENCY OF THE EVIDENCE

On appeal, Foster first challenges the sufficiency of the evidence to support his convictions. Foster concedes that S.M.'s testimony satisfied the elements of his convictions, but he argues that the State relied on "improper and suggestive interviews" and S.M.'s "story was unreasonably tainted." The State responds that the jury found S.M.'s testimony credible and that is enough to convict Foster.

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

5

Relying on *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983), Foster argues that our Supreme Court has, in rare cases, found that even if testimony supports a conviction, an appellate court may find the testimony so incredible as to defy belief. In *Matlock*, a jury convicted Matlock of raping his stepdaughter in their house even though four witnesses in the house when the alleged rape occurred testified that they did not hear or see anything to support the stepdaughter's accusation. Our Supreme Court reiterated that, in Kansas, the testimony of the accuser is, on its own, sufficient to uphold a conviction even if there is no corroboration. 233 Kan. at 3. But the court found such testimony is insufficient when it "is so incredible and improbable as to defy belief." 233 Kan. at 3. After reviewing the evidence, the *Matlock* court found the stepdaughter's testimony defied belief and that her testimony was not so convincing "that a rational factfinder could find the defendant guilty beyond a reasonable doubt." *Matlock*, 233 Kan. at 6.

In *Matlock*, the court considered 14 factors that it believed undermined the victim's credibility that she was raped, including:  the alleged rape took place when several family members were present in the house; the rape allegedly occurred on an old, creaky bed in a room between the victim's two sisters who were home then; none of the family members heard anything that night; the victim told no one about the attack until 15 months later; the victim did not clean herself after the attack and wore the same underwear that she had worn during the attack the next day; the victim demonstrated friendly feelings towards her father before and after the alleged rape occurred; the victim admitted that she wanted to remain the decision-maker of the family, which she had been during her father's stay in prison, and admitted that she had threatened at times to send her father back to prison when he made family decisions with which she disagreed; and she admitted that "lying had been a part of her life for a long time." 233 Kan. at 4-5.

Foster argues that S.M.'s testimony is similarly not credible because S.M. was persuaded and influenced by all the questioning by Mother, Sister, and the officers. Foster asserts that before the basement incident, S.M. never complained of sexual abuse

6

by him. He argues that the basement incident, which he was not convicted of, set in motion all the other allegations and charges against him. Foster believes that S.M. was influenced by Mother's accusations and suspicions of that night; by the officer's questioning; and by Sister's genital examination. He argues that this court must vacate his convictions because there was no physical evidence and the inconsistencies in S.M.'s story, along with Mother's and Sister's behavior, make S.M. not credible.

We find that *Matlock* does not control. The *Matlock* court relied heavily on the presence of discerning witnesses who should have seen or heard the assault if the alleged victim's testimony were true. Despite our Supreme Court's ruling in *Matlock*, the law in Kansas is that the testimony of the accuser alone is enough to sustain a rape conviction without further corroboration. *State v. Cooper*, 252 Kan. 340, 347, 845 P.2d 631 (1993); see also *State v. Brinklow*, 288 Kan. 39, 53, 200 P.3d 1225 (2009) (noting that *Matlock* was an "aberrant" decision, and that *Matlock* was "perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix to reverse a conviction for rape"); *State v. Elnicki*, 279 Kan. 47, 68-69, 105 P.3d 1222 (2005) (finding sufficient evidence to support convictions of rape and aggravated criminal sodomy in response to a *Matlock* challenge).

S.M.'s testimony was directly corroborated by the testimony of Mother, Sister, Briggs, and Bisel. For the most part, S.M.'s statements and testimony were consistent and reliable. The only inconsistency in S.M.'s testimony was when the sexual abuse started. S.M. said in the Sunflower House interview that the abuse started when she was 10, but on the stand, S.M. testified she was "about 10, 11, 12-ish" when the abuse started. This minor inconsistency does not render S.M.'s testimony so incredible as to defy belief.

An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *Aguirre*, 313 Kan. at 209. Reviewing the evidence in the light most favorable to the State, we conclude that a rationale fact-finder could have

7

found Foster guilty of the charges for which he was convicted beyond a reasonable doubt. As a result, Foster's challenge to the sufficiency of the evidence fails.

PROSECUTORIAL ERROR

Foster next asserts that the prosecutor committed reversible error during closing argument when the prosecutor made the statement, "Where there is smoke, folks, there is fire." Foster argues that the statement diluted the State's burden of proof. The State responds that the prosecutor did not commit error and that the closing argument was within the wide latitude allowed under Kansas law. Alternatively, the State argues that if the statement was improper, it was harmless error.

The appellate court applies a two-step analysis to claims of prosecutorial error. First, it must determine whether an error occurred. Second, if an error occurred, the court must determine whether the error caused prejudice. *State v. Patterson*, 311 Kan. 59, 70, 455 P.3d 792 (2020). In determining error, we are to consider whether the "prosecutor's actions or statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.'" 311 Kan. at 70.

In the State's closing argument, the prosecutor said:

"[S.M.] told you what happened. . . . [Mother] told you what she saw. Where there is smoke, folks, there is fire. She believed, in her gut, something was wrong. Pulled away the blanket. Saw the defendant's hands. Saw her daughter's clothes down. That is what she told the police then. That is what she said in court. [S.M.] told people at Sunflower House and she told us here that he was touching her before she fell asleep.

"When she fell asleep, she said, I don't know, I was asleep, which makes sense. What we do know, folks, is over the years, from when she was about 11, this defendant

8

was touching on her. He touched on her then. He touched on her on May 17th of 2019, when he licked on her. And he touched on her on the 28th.

. . . .

"Folks, he had done this before. He touched on [L.F.]. And he touched on [S.M.]. She has absolutely nothing to gain from saying that this happened to her. Absolutely nothing. If anything else, it's just ruined her world."

In full context, the prosecutor was talking about Mother's actions. The prosecutor was not asking the jury to convict Foster based on "smoke" but was explaining why Mother pulled the blanket off Foster and S.M. But even assuming the statement was improper, the error is harmless because it did not dilute the State's burden of proof or contribute to the verdict. In fact, the prosecutor was discussing the basement incident when this statement was made. The jury did not convict Foster of the basement incident. We find the prosecutor's statement does not amount to reversible error.

Affirmed.