No. 93,412

STATE OF KANSAS, *Appellee,* v. ARTURO J. GARCIA, *Appellant.*

144 P.3d 684

Opinion filed October 27, 2006.

*Virginia A. Girard-Brady*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *David Lowden*, assistant district attorney, *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Arturo Garcia was convicted by a jury of two counts of premeditated first-degree murder and one count of intentional second-degree murder. Garcia was sentenced to hard 50 sentences for each of the first-degree murder convictions and to 165 months' imprisonment for second-degree murder. The three sentences are to run consecutively. Garcia appeals his convictions and hard 50 sentences claiming (1) he was denied his statutory right to a speedy trial; (2) the district court abused its discretion by admitting certain statements of witnesses; (3) the district court abused its discretion by admitting testimony of witnesses regarding statements Garcia made to the witnesses; and (4) the district court violated the United States Constitution by imposing hard 50 sentences without first having a jury determination that the aggravating circumstance existed beyond a reasonable doubt.

## FACTS

Arturo J. Garcia was charged with first-degree murder of Clint Jones on or about July 26 to July 27, 2003; Oscar Ramirez on or about July 30 to July 31, 2003; and Nicholas Ramirez on or about July 30 to July 31, 2003. The jury found him guilty of first-degree murder of Clint Jones and Nicholas Ramirez and guilty of intentional second-degree murder of Oscar Ramirez.

The murders took place at a club in Wichita, Club Mexico, that was jointly owned by the defendant Garcia and Luis Hernandez. Garcia shot the victims. They were then dismembered and burned in barrels in a field in Cowley County. The charred and highly fragmented skeletal remains were later identified by a forensic anthropologist as 3 males: one Caucasian between 22 and 35 years old and two Hispanics, one 25 to 35 years old and the other in his

20s. The forensic anthropologist's findings are consistent with the gender, ethnicity, and ages of Clint Jones, 30, Oscar Ramirez, 27, and Nicholas Ramirez, 22.

At trial, the anthropologist testified that one of the victims had been shot in the head. By the location and distance of the weapon from the skull, the anthropologist ruled out suicide and accident. He further testified about signs of dismemberment of the bodies— several limb bones had been sawed or chopped off, other bones were cut part way through and then snapped off, and a lower jaw showed signs of having been cut off. Debris recovered from a fire pit where the bodies had been buried included pliers, a serrated blade, a 6" curved blade, and an 8" x 6" blade. Through DNA testing, one of the skeletal remains was determined to be Clint Jones. Jones and Garcia had a business relationship. Jones had installed a $6,000 sound system in Club Mexico. In addition, using a key to the vehicle lockbox at a Wichita auto dealership, Jones stole at least five vehicles, delivered the vehicles to Garcia, and was to be paid $2,000 for each stolen vehicle. Jones' housemate was unaware of any payment by Garcia to Jones for the sound system installed or the three stolen vehicles Jones had delivered to Garcia.

Beginning the weekend of July 19 and 20, 2003, after regular hours, the Club Mexico allowed more than 150 people to enter at 3 a.m. for a rave. A rave was described as an after-hours party with loud music and drugs. The drugs, mainly ecstasy, were sold in the Club Mexico by Garcia associates, including Bobby Seigler. Seigler had met Garcia through Danny Yoke, a Garcia associate. Yoke had obtained drugs from a person connected with Garcia, and Seigler obtained the ecstasy he sold at the raves from Yoke. At the trial, Seigler estimated they made $3,000 to $4,000 selling ecstasy at the first rave.

Another rave was held the weekend of Saturday, July 26, and Sunday, July 27, 2003, at Club Mexico. Seigler was at the club to sell drugs and assist with security. Carlos Lacayo-Arce, who frequented the club and occasionally sold cocaine and marijuana at the club, arrived at approximately 3 a.m. He drank some tequila and took ecstasy.

At approximately 6 a.m., Garcia asked Lacayo-Arce to go to the basement of the club with him to discuss building a methamphetamine laboratory there. Once in the basement, Garcia asked Lacayo-Arce to kill Jones with a 9 mm rifle with a sawed-off handle that was on a couch, behind the cushion. Garcia did not say why he wanted Jones killed. Later Lacayo-Arce heard Jones was killed because of money owed by Garcia to Jones. While Lacayo-Arce and Garcia were in the basement, Yoke found Seigler and asked him to meet someone named Carlos in the basement. After showing Lacayo-Arce how to use the gun , Garcia went back upstairs, returned a few minutes later with Seigler and Josh Thorpe, an individual who hung around with Seigler. Garcia explained to them that Lacayo-Arce would be the trigger man and the other two were to make sure things went right.

Garcia went upstairs and returned to the basement with Jones where they talked about the methamphetamine lab. Garcia introduced Jones to the three men, who were sitting on the couch, and then said he was going upstairs to get his cigarettes. After Lacayo-Arce started a conversation with Jones about the dog Jones was carrying, Garcia grabbed the rifle from behind the couch cushion and shot Jones six or seven times, until Jones fell on the floor. Shocked by the shooting, the men on the couch stood up. Garcia kicked Jones' body to see if Jones was alive and then said he wondered how the dog's testimony would hold up in court. Garcia later killed Jones' dog. Garcia then informed the other men they had better help him or they would also be lying on the floor.

When Seigler returned upstairs after the killing, Yoke kissed Seigler on the forehead and said to him that he "was part of the family now." When Garcia shot Jones, there were several hundred people upstairs partying in the club. After the shooting, Seigler returned to selling drugs, and, as ordered by Garcia, Lacayo-Arce guarded the back door.

After the scheduled end of the rave, midday on Sunday, Garcia, Seigler, Thorpe, and Lacayo-Arce returned to the basement. At Garcia's direction, they stripped Jones' clothes from his body, placed the clothes in a plastic trash bag, and mopped blood off the basement floor. Thorpe and Lacayo-Arce were ordered to clean

out a refrigerator in a room back of the bar and to put Jones' body in the refrigerator. To place the body in the refrigerator, they would have to bend the body in half. To accomplish this, they used a serrated knife to cut through the skin. Garcia then showed them how to dismember the body. The two took turns thrusting with a chisel mounted on a long, heavy pole to cut the body at the waistline. After cutting the body, they were able to fold the body in half. They then wrapped the body in plastic and secured the plastic wrap with tape. Garcia, Seigler, and Yoke carried the wrapped body upstairs, placed it in the refrigerator, and then taped the refrigerator door shut. Using the back door of the club, they loaded the refrigerator onto a truck. Lacayo-Arce and Garcia drove the truck with the refrigerator to Garcia's house, where they placed the refrigerator in the garage.

On July 31, 2003, Oscar Ramirez left his house about 5 p.m. with his brother, Nicholas Ramirez, in Nicholas' car. Oscar and Nicholas Ramirez were cousins of Luis Hernandez. Oscar did not return. Oscar's wife reported the brothers missing on August 4.

Seigler received a telephone call from Garcia on July 31 instructing him to bring Christy Cousins to the club to help clean the bathrooms. When Seigler and Cousins walked into the club, they saw the bodies of the Ramirez brothers. The younger brother was by the bar and the other brother was in the VIP room, already wrapped in plastic. A young boy, who was in a back room watching television, was the only other person with Garcia. Garcia told Seigler that the boy "was part of the team now."

Garcia informed Seigler that he let the brothers come into the club before it had opened. Garcia stated to Seigler that he served them drinks until one of the brothers ripped a surveillance camera off the ceiling of the club and the other brother punched Garcia in the jaw. To protect himself Garcia pulled out his pistol. The brothers kept coming at him. When one brother asked if Garcia was going to shoot him, Garcia shot both brothers. Garcia's explanation for the altercation was that it had to do with something that happened between the three of them a long time ago. They then wrapped the body by the bar in plastic and dragged both bodies

to the basement. Garcia sent Seigler to purchase cleaning supplies, gloves, bleach, trash bags, and plastic.

Garcia telephoned Lacayo-Arce, stated the club was being shut down, and asked him to help move furniture. Seigler and Cousins were at the club when Lacayo-Arce arrived. Cousins was cleaning blood from the carpet in the bar area. Lacayo-Arce went to the basement with Garcia and there he observed two bodies in the middle of the floor wrapped in black plastic with only the shoes exposed. Lacayo-Arce and Garcia moved the bodies to another room in the basement. Garcia explained that the brothers had ripped off the cameras in the bar area, punched him in the face, and tried to get him with a broken beer bottle before he shot them. Neither Seigler nor Lacayo-Arce observed a broken bottle. Garcia told Lacayo-Arce one of the brothers did not die when shot the first time. Garcia related that he went to the back room for another gun, returned, and using a pillow to muffle the sound, shot the surviving brother in the head.

A few days later, Lacayo-Arce returned to the club to help Garcia dispose of the bodies. The bodies were still in the basement, but were no longer whole. The heads had been severed from the bodies, and the lower jaws had been cut from the heads. The arms and legs had been cut off the bodies, cut in pieces, and stacked in a pile. Each torso had two bullet wounds in the chest. Lacayo-Arce saw a butcher knife, a serrated electric knife, and an ax.

He and Garcia then donned rain ponchos, rubber gloves, and surgical masks. Using the electric knife, they cut the torsos open. Garcia then took out the internal organs and placed them in a bag held by Lacayo-Arce to blunt the smell. Garcia poured bleach into the torsos. They then double-bagged the internal organs and Saran-wrapped the limb parts and placed them into plastic bags. As he gave Lacayo-Arce a severed hand, Garcia jokingly asked if he needed a hand. The bags of body parts were put into duffle bags or backpacks and driven to Garcia's house, where they were placed in a freezer in the garage near the refrigerator containing Jones' body.

On August 6, Garcia asked Lauren Bertsch, a cocktail waitress at Club Mexico, if he could use her family's land in Cowley County

to burn trash because Seigler had been unable to find pigs to eat the trash. Bertsch and Garcia drove Jones' pickup to the back door of the club, where they put trash bags and two barrels in the truck bed. They then drove to Garcia's house. Garcia unlocked the garage, and they loaded some of the bags from the freezer into the barrels in the truck bed. There was fluid in the freezer that reeked of death. Bertsch looked inside a bowling ball bag and found a human head wrapped in a garbage bag. She unwrapped a bag containing a lower leg with the foot attached.

It was dark when they arrived at her family's land. Garcia told Lauren Bertsch that there were parts of three people in the back of the truck; Jones and two guys who had threatened him at the club. At the farm's burn site, they lowered the barrels to the ground. Garcia put trash in with the body parts, poured on fuel, and lit the fire.

Several hours later, Lauren Bertsch drove back to Wichita as Garcia napped. They returned to Garcia's house to get the remaining body parts. They then picked up a friend, learned of a party, went to the party, and stayed at the party for awhile. Two groups of people, four in addition to Bertsch and Garcia, left the party and went to the burn site. Garcia burned more body parts while the others set up a tent, drank, shot a rabbit, and just hung around.

## RIGHT TO SPEEDY TRIAL

Garcia was arraigned on October 14, 2003. His trial began 217 days after arraignment, on May 17, 2004. Garcia contends that he was denied his statutory right to a speedy trial.

K.S.A. 22-3402 provides in part:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5).

. . . .

"(3) The time for trial may be extended beyond the limitations of subsections (1) . . . for any of the following reasons:

. . . .

(c) There is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe that such evidence can be obtained and trial commenced within the next succeeding 90 days. Not more than one continuance may be granted the state on this ground, unless for good cause shown, where the original continuance was for less than 90 days, and the trial is commenced within 120 days from the original trial date."

What the State advocates is use of a two-step approach; first a limited review, followed by a separate unlimited review. The first step is to consider whether the trial court abused its discretion in granting the motion for continuance, followed by application of the speedy trial statute if there was no abuse of discretion. *State v. White*, 275 Kan. 580, 600, 67 P.3d 138 (2003), is cited by the State to support this position.

In *White*, the court had used the two-step approach because the defendant argued both that his statutory right to a speedy trial was violated by the trial court's "(1) granting a 90-day continuance [and] (2) failing to start the trial within the extended deadline." 275 Kan. at 598. The *White* court first reviewed the trial court's granting the continuance for an abuse of discretion, 275 Kan. at 600, and then determined whether there had been a violation of White's statutory right to a speedy trial de novo, 275 Kan. at 598, 600-01.

From the State's perspective, a link is to be made between the appellate court's consideration of the trial court's granting of a continuance and the appellate court's application of the speedy trial statute. The procedure advocated by the State, however, does not accomplish what it wants. Here, the defendant has not requested this court to review the trial court's decision to continue the trial.

Garcia argues the issue is whether the trial court erred in denying his motion to dismiss on the ground that his statutory right to a speedy trial was violated. Common sense suggests that when reviewing a trial court's denial of a motion to dismiss criminal charges, the applicable standard of review is determined by the ground on which dismissal was sought rather than a blanket standard for motions to dismiss. For example, review of a trial court's

denial of a motion to dismiss for insufficient evidence asks whether review of all the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. See, *e.g.*, *State v. Cohen*, 229 Kan. 65, 71, 622 P.2d 1002 (1981). But review of a trial court's denial of a motion to dismiss on a strictly legal ground would be unlimited. The statutory speedy trial question now before the court is a matter of law over which this court has unlimited review. *State v. Davis*, 277 Kan. 309, Syl. ¶ 10, 85 P.3d 1164 (2004).

At the time of arraignment on October 14, 2003, trial was scheduled for December 8, 2003. Fifty-five days elapsed between October 14 and December 8. A continuance of the trial date to January 20, 2004, was obtained by defendant. A continuance of that trial date to February 2, 2004, was obtained by defendant. Then the State obtained continuances from trial settings of February 2, February 9, February 17, and February 23, 2004. Trial began on May 17, 2004. One hundred and five days elapsed between February 2 and May 17; 84 days elapsed between February 23 and May 17.

At a hearing on February 20 on the State's motion for continuance, the State informed the trial court that nuclear DNA tests performed to that date had established the identity of only one of the three persons Garcia was charged with killing. In order to establish the identities of the other two persons, the State wanted to have the FBI conduct mitochondrial DNA tests on the remains. Although the average time required by the FBI for mitochondrial DNA testing was 8 months, the State told the trial court that this case would receive priority so that the FBI testing would be complete "within a couple of months." In addition to the prohibitive cost of having a private lab conduct the tests, the State urged the trial court to take into account that the credentials of the FBI lab are "absolutely stellar."

In opposing the motion, defense counsel stated: "[M]y understanding from information I received from the State is they, several weeks ago, were told they could have the testing done by a private lab, but the cost of $10,000 to get it done during that time period

was prohibitive." Defense counsel also questioned the materiality of the evidence, noting that the admissibility of mitochondrial DNA evidence (as opposed to nuclear DNA evidence) has not been decided by a Kansas appellate court. Defense counsel further argued that the admissibility of the test results was questionable, particularly in the circumstances of this case, because it can only be used to show maternal lineage and cannot be used to identify an individual. As noted by the State, knowing the maternal lineage would aid in identification of the remains.

The trial judge ruled that DNA identification of the remains was material. Further, because the cost of private lab analysis would be prohibitive, the trial judge concluded that the DNA evidence was unavailable at the time of the hearing, February 20, 2004. The trial judge expressed the view that the circumstances fit within the standards of K.S.A. 22-3402 for finding evidence was "unavailable."

On April 26, 2004, about 3 weeks before the scheduled trial, defendant filed a motion to dismiss for denial of speedy trial. In particular, Garcia questioned the trial court's finding that the DNA evidence was unavailable within the meaning of the speedy trial statute. At a hearing on May 5, 2004, defense counsel argued that, even though the State had the charred remains for months and the specimens to be tested were chosen on January 14, 2004, the State did not submit the specimens for mitochondrial DNA testing until February 12, 2004. In other words, defendant argued that the State did not make a reasonable effort to obtain the evidence within the speedy trial limit. Defendant also asserted that there is no provision in the statute for deeming evidence unavailable because the State did not want to spend the money required to make the evidence available within the speedy trial limit and, in addition, the State never established or represented it could not pay for the private DNA testing. The State countered that it had been pursuing nuclear DNA testing for many months and did not seek mitochondrial DNA testing as an alternative until it began to run out of time and did not have what it needed from the nuclear DNA testing. The State then revealed that the mitochondrial DNA testing had failed because the specimens were too charred.

The trial court overruled Garcia's motion to dismiss, stating:

"The Court is going to find that under the facts and circumstances of the case, attempting to pursue the PCR DNA evidence first before going to the mtDNA test is the proper way to proceed. It's unreasonable to expect the State to proceed on equal and parallel fashions with regard to all potential DNA under the circumstance of the case and under the monetary limitations put on all parties in this case. Simply put, if the DA had wanted to, she could have, but it was not necessary to do that.

"Now, then, that means it's reasonable for the DA in this case to start working on the mtDNA once they determine that the PCR would not be a complete test or the other tests that they use in order to determine the *corpus delicti* was not sufficient. The Court is going to find that they did make reasonable efforts to get, and that Judge Owens was correct (in granting the continuance under 22-3402), to get the DNA evidence, and that they were making reasonable efforts to procure the mtDNA evidence.

"The Court is going to find that under the circumstances of the case at the time that the DA determined that the motion was necessary, that the evidence was unavailable. The statement that I heard today is—is a little—is slightly different than what Judge Owens heard, but it is still essentially the same. Number one, that availability does have something to do and is part and parcel with funding availability. But more important, what I heard today was that even if they had used the private lab shortly before or at the time of the motion, it might have been available or it might not have been available. Under those circumstances, the Court is going to agree with Judge Owens, that the evidence was unavailable at the time that the motion was made and for the short time before the motion was made.

"Now, with regard to the last test, which is that there are reasonable grounds to believe that the evidence can be obtained, the trial commenced within the next succeeding 90 days—and the operative word in that is 'can.' It doesn't say 'must.' It says can be obtained. Meaning it's a possibility.

"And number one, even if we concede that what [defense counsel] is saying, that the private lab is the controlling issue here, that by definition means it could have been obtained within the 90 days. And even if I agree with the DA's argument, which I have, that attempting to go through the FBI was proper, based upon the statements here today and based upon what [defense counsel] has conceded as far as the memos that he's seen—and I'm not—I'm not finding that you have agreed that the memos are correct, but what you have seen. But that in itself is enough for a court to determine that the evidence could be obtained within the 90 days. And especially given that we've now had a report from the FBI that there is not sufficient DNA in order to do the mtDNA test. That demonstrates that it could have been obtained within the 90 days. So essentially while there was evidence there, it's now a fact. And there was evidence there before the motion, it's now a fact subsequent to the motion that came out within 90 days. Under those circumstances, the Court finds that the motion to dismiss for denial of speedy trial must be denied."

On appeal, Garcia contends that the DNA evidence was not unavailable within the statutory limit because test results could have been obtained from a private lab within the speedy trial limits. Defendant cites *Unites States ex rel. Green v. Washington*, 917 F. Supp. 1238, 1273-77 (N.D. Ill. 1996), for the proposition that budget constraints are not a proper basis for denying constitutional protections.

*Green* was a class action in which the class members were indigent, incarcerated defendants represented by the Illinois Office of the State Appellate Defender (OSAD) and whose appeals had remained unresolved for 2 years or more after the filing of the notices of appeal. 917 F. Supp. at 1240-41, 1282. The class action alleged a systemic problem of unconstitutional delay in which 45% of the class members would have served out their sentences before a decision would be rendered in their appeals. 917 F. Supp. at 1272. The inordinate delays of the defendants' trials, which were necessitated by the Illinois Legislature's chronic underfunding of OSAD, were found to violate the indigent defendants' due process rights. 917 F. Supp. at 1270.

Here, the State's position is that the DNA evidence was unavailable because the cost of obtaining it soon enough to avoid a continuance of the trial was prohibitive, which made the State's conduct in avoiding the cost by seeking a continuance reasonable. To support its argument the State cites *White*, 275 Kan. at 599, in which the State waited until June 13, with trial scheduled for July 10, to request a continuance because over 100 pieces of ballistic evidence still needed to be tested. White argued that the request for continuance was not made in good faith because the State had not diligently pursued having the tests timely performed. 275 Kan. at 599. This court quoted the following remarks of the trial court:

" 'If there's over a hundred pieces of ballistics evidence that needs to be examined, that's all very meticulous work, it's very time consuming. Unfortunately, the people that can do that are very few and far between, and it appears to me that there has not been any sort of delay that's caused simply for the purpose of delay, that Ms. Lidtke's request is based upon a good faith basis.' " 275 Kan. at 600.

The *White* court found the defendant's right to a speedy trial had not been violated because the delay was less than 90 days.

The State also cites *State v. Brown*, 266 Kan. 563, 571, 973 P.2d 773 (1999), in which on June 6, the scheduled trial date of June 17 was continued "in order to send bone and teeth fragments to the FBI laboratory for PCR DNA testing." Brown argued that the DNA test did not meet the *Frye* test and that "the continuance was based upon false information because dental records were expected to be obtained but ultimately could not be located." 266 Kan. at 571. The court found the evidence the State attempted to obtain was material and had met the *Frye* test; therefore, there was no merit in the contentions.

*Green*, the federal case relied on by Garcia, indicated that delay amounting to a violation of due process is not absolved because it was a consequence of inadequate state funding of the appellate defender's office. 917 F. Supp. 1238. *Green* is distinguishable on several counts from the circumstances of the present case. *Green* was not a speedy trial issue, and there is no assertion as in *Green* that the delay here was a consequence of inadequate funding of the prosecutor's office. The consideration in this case is unavailable material evidence. Reasonable efforts were made to procure the evidence, and there were reasonable grounds to believe that the evidence could be obtained within 90 days. In neither *White* nor *Brown*, however, did the court expressly examine the statutory considerations or intimate any possibility that the statutory requirements were not satisfied.

The argument pressed by Garcia, that the evidence was not unavailable, was not made in the cases brought to the court's attention. And there is an absence of examination of the statutory requirements in the cases cited. Although there may be a question about proper analysis of a K.S.A. 22-3402(5)(c) speedy trial issue, it reasonably may be inferred from the ease with which this court concluded that there were no speedy trial violations in *White* and *Brown* that there was no violation under the circumstances of the present case. Using a step-by-step analysis of the statutory requirements, the analysis of the trial court in overruling Garcia's motion to dismiss for violation of his right to a speedy trial is sound and adopted in this case.

## STATEMENTS MADE BY DANNY YOKE TO BOBBY SEIGLER

On appeal, Garcia argues that Seigler's account of Yoke's saying he now was part of the family constituted inadmissible hearsay, and admission of that statement violated his Sixth Amendment right to confront witnesses against him.

Seigler twice testified that, after Garcia shot Jones, Seigler went back upstairs to the main area of the club where Yoke kissed him on the forehead and told him he "was part of the family now." The first time, the prosecutor asked Seigler what Yoke did, and the witness responded with what Yoke said as well as what he did. Defense counsel objected. After conferring with counsel at the bench, the trial judge found "there was a plan" and overruled the objection "based upon 460(i)(2)." Once that ruling was made, the State began to downplay the evidence of a plan and argued that Yoke was unavailable and that his statement was a part of the res gestae. The trial judge requested a briefing on the issue and recessed for the weekend.

When the court reconvened, defense counsel argued that what Yoke said was hearsay. The State argued it was admissible hearsay as part of the res gestae that established the relationship of the parties. The State also suggested that it was not hearsay because it was not offered to show that Seigler actually was the member of a family "as that word has a common meaning."

The trial judge ruled that the statement was admissible. In reaching this conclusion he found that Yoke was unavailable, the statement was reliable, was nontestimonial, and was made at a time when there was no incentive for Yoke to falsify the statement. The trial judge concluded that the statement was not hearsay because it was not offered for the truth of the matter asserted and/or "meets the exception under 460(d)(3)."

The second time Seigler was asked what Yoke did, he testified that Yoke kissed him on the forehead. When asked what Yoke said, Seigler responded: "Told me that I was part of the family now." There was no objection.

An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. Once

relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. *State v. Jackson*, 280 Kan. 16, 33, 118 P.3d 1238 (2005). There is no argument that Seigler's testimony was not relevant. When the underlying facts are undisputed, an appellate court's review of whether a witness was available or unavailable and whether a Confrontation Clause issue arose is de novo. See *State v. Bailey*, 263 Kan. 685, 697, 952 P.2d 1289 (1998). *State v. Carter*, 278 Kan. 74, 77-78, 91 P.3d 1162 (2004).

Here, it is undisputed that Yoke was unavailable. Garcia's argument that the trial court erred in ruling that the evidence fit within the 60-460(d)(3) exception to the hearsay rule, hence, will be reviewed for abuse of discretion.

K.S.A. 60-460 provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

"(d) A statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

Garcia argues that the statement was offered for the truth of the matter stated. Garcia asserts the subject of Yoke's statement was "Garcia's membership in an organized crime family," and it was offered to show that Seigler's witnessing Jones' murder was "akin to an initiation" into an organized crime family. Garcia's argument reads more into the statement than actually is there. Yoke did not say "organized crime family." He stated Seigler was part of the family now and was to take what he had seen to the grave. Yoke was telling Seigler that he now was involved and he was to keep quiet about what he had witnessed. Yoke's statement was offered by the State as evidence of the truth of that fact.

Garcia contends that the K.S.A. 60-460(d)(3) exception to hearsay is inapplicable because Yoke, who did not witness Jones' murder, had not perceived the matter when he made the statement.

In other words, Garcia construes "the matter" in the phrase "when the matter had been recently perceived by the declarant" to mean the crime charged. But we note that "the matter" as used twice in the exception clearly refers to the subject of the contested statement in the first use and logically would mean the same thing in the subsequent use. "The matter" in this instance is Seigler's being involved in Jones' murder.

The hearsay exception applies to Yoke's statement. Yoke was unavailable. His statement was made when Seigler came up from the basement immediately after the murder occurred, prior to the State's filing of charges, and when there was no incentive to falsify.

Garcia next argues that the statement about Garcia's membership in an organized crime family was inadmissible evidence of bad character under K.S.A. 60-447. This argument was not advanced at trial. A party must make a specific objection to the admission of evidence at trial in order to preserve the issue for appeal. *State v. Kunellis*, 276 Kan. 461, 477, 78 P.3d 776 (2003). Issues not raised before the trial court generally cannot be raised on appeal. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003).

Citing *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), Garcia contends that admission of Yoke's statement violated Garcia's Sixth Amendment right to confront witnesses against him. This argument is barely formed; it consists of a quote from *Crawford* and the assertion that the trial court's finding Yoke's statement reliable was "clearly at odds with the concerns expressed in *Crawford* regarding the amorphous and subjective nature of the concept of reliability."

Like Garcia's 60-447 argument, his constitutional argument was not made in the trial court. One of the exceptions recognized by this court to the general rule that a new legal theory may not be asserted for the first time on appeal is that consideration of the theory is necessary to serve the ends of justice or to prevent a denial of fundamental rights. *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005).

The trial judge found that Yoke's statement was nontestimonial. In *Crawford*, the United States Supreme Court drew a dispositive

distinction between testimonial and nontestimonial hearsay evidence by noting:

"Where *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v.*] *Roberts*, [448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where *testimonial* evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." (Emphasis added.) 541 U.S. at 68.

Yoke's statement to Seigler was made by one Garcia associate to another in the absence of any governmental or law enforcement authority in a nonofficial setting. As the trial judge determined in this case and Garcia does not dispute, the statement was not testimonial, hence, Crawford is not applicable.

## TESTIMONY OF WITNESSES ABOUT STATEMENTS MADE TO THEM BY DEFENDANT

Garcia next complains that the admission of testimony by Lauren Bertsch and Emily Armstrong that Garcia had encouraged each of them to kill someone was error. Bertsch testified she had the following conversation with Garcia as they drove to her family land to burn the bodies:

"A. Yes, there was a discussion about—about being—being a cleaner. And—but in order to clean you had to hit first.
"Q. Now, do you have any—how did this discussion come up?
"A. I don't recall.
"Q. And did you have any idea what it related to?
"A. I interpreted it as cleaning basically.
"[DEFENSE COUNSEL]: I would object as to hearsay. It doesn't fit within one of the exceptions for a statement by a defendant. Also doesn't show relevance.
"THE COURT: Overruled.
"A. Basically what was done here, preparing it to be disposed, cleaning up after a mistake. And in order to be one of those, to be trustworthy enough, you had to kill someone first, and that's how I interpreted his comment.
"Q. So is there an occupation of a person called the cleaner?

"A. Not that I know of. But I just—I assumed it was just lingo that was used by him personally, his word choice. I don't think there's really any—an occupation that's called the cleaner unless you're talking about laundry cleaner or something.
"Q. And in order to do that you had to hit first.
"A. Right.
"Q. And to hit first meant?
"A. To kill somebody."

Armstrong, who worked as a prostitute at Club Mexico, gave the following account of a conversation she had with Garcia while they were at a drive-in restaurant:

"Q. And how did this conversation begin?
"A. I was griping about my fiancé.
"Q. And what were you griping about?
"A. How he didn't want me at the club, how he was holding me back, how he was tying me down.
"Q. Did Mr. Garcia have any recommendations?
"[DEFENSE COUNSEL]: Object as to relevance.
"THE COURT: Overruled.
"A. I've forgotten where he was. He was trying to prepare me, to beef me up to be able to take him out.
"Q. And what did he say?
"A. How there's so much more I could do. How much freer I would be if I could eliminate my fiancé.
"Q. Did he tell you how that could be done?
"A. Indirectly.
"Q. What did he say?
"A. That we could work up to being able to take him out, to start off on small animals, things like that.
"Q. And how were you going to start with small animals?
"A. I think actually specifically he said a dog.
"Q. What did he say about a dog?
"A. That if I could be able to shoot it, that it shouldn't be any problem for me to be able to take Joe out.
"Q. And when you say 'take Joe out,' what do you mean?
"A. To kill him. To shoot him."

As clearly can be seen in the excerpts, the objections to this testimony at trial were on grounds of hearsay and relevance. On appeal, Garcia's contention now is that the evidence was of specific instances of conduct tending to prove bad character, as proscribed by K.S.A. 60-447. We note that a party must make a specific ob-

jection to the admission of evidence at trial in order to preserve the issue for appeal. *Kunellis*, 276 Kan. at 477. Issues not raised before the trial court cannot be raised on appeal. *Williams*, 275 Kan. at 288.

Garcia also contends that the complained-of testimony was not relevant to the murders of Jones and the Ramirez brothers.

This court's first consideration when examining a challenge to a district court's admission of evidence is relevance. 280 Kan. at 33. The determination of relevance is a matter of logic and experience, not a matter of law. *State v. Trammell*, 278 Kan. 265, 282, 92 P.3d 1101 (2004).

" 'Relevant evidence' means evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The State's position is that the testimony was relevant to a determination of defendant's guilt of the murders because it established and explained defendant's influence over people and his level of culpability. Neither is at issue in this case. Garcia killed all three victims. He did not influence other people to kill the victims. Garcia's level of culpability was 100%. There was no evidence to suggest otherwise. The trial court did abuse its discretion in admitting the testimony.

The State urges that if this court finds errors in admission of the testimony of Bertsch and Armstrong, it further finds that the errors were harmless rather than prejudicial. To determine whether trial errors are harmless or prejudicial, each case must be scrutinized in the light of the trial record as a whole. *State v. Abu-Fakher*, 274 Kan. 584, 613, 56 P.3d 166 (2002). Reversal is required only where an erroneous admission of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice. *State v. Engelhardt*, 280 Kan. 113, 130, 119 P.3d 1148 (2005). Here, the State's overwhelming evidence of Garcia's guilt led to his conviction without regard to the admission of the testimony of Bertsch and Armstrong.

Finally, Garcia challenges the constitutionality of imposing a hard 50 sentence without a jury determination that an aggravating circumstance exists beyond a reasonable doubt. In *State v. Douglas*, 274 Kan. 96, 111-12, 49 P.3d 446 (2002), *cert. denied* 537 U.S.

1198 (2003), this court rejected the same challenge. Garcia has presented no reason why the court should revisit the holding of *Douglas*. In fact, Garcia fails to mention *Douglas*.

Affirmed.