NOT DESIGNATED FOR PUBLICATION

Nos. 114,837
114,838
114,839

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.B.

In the Interest of M.B.

In the Interest of A.S.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed August 26, 2016.
Affirmed.

*Rachelle Worrall*, of Law Office of Rachelle Worrall, of Prairie Village, for appellant.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for
appellee.

*Ashlynn L. Yarnell*, of Ronald W. Nelson PA, of Lenexa, guardian ad litem.

Before POWELL, P.J., ARNOLD-BURGER, J., and WALKER, S.J.

*Per Curiam*:  T.B. (Mother), the natural mother of three children in these
consolidated cases, appeals from the district court's decision terminating her parental
rights to two of the children and creating a permanent custodianship for the third child.
Because we find clear and convincing evidence supports the district court's decisions, we
affirm.

1

Mother is the natural mother of J.B., M.B., and A.S. J.B. (Father) is the natural father of J.B. and M.B. J.G. is the natural father of A.S. Neither father is a party to this appeal.

In October 2013, the Kansas Department for Children and Families (DCF) received a report of possible physical neglect after J.B. came to school with a cockroach in his lunchbox. Whitney Condie, a DCF social worker, interviewed J.B. at school. J.B. told Condie that he lived with his great-grandfather and that there were a lot of cockroaches in the house, mice in the basement, and rats one time came into his bedroom. J.B. said the house was messy and that his sister slept with him because her room was messy. Condie went to the house, and an older man answered the door. He said that Mother and J.B., referring either to Father or J.B., lived there, but Condie was not able to make contact with either parent.

Several days later Condie was able to meet with Mother, J.B., and A.S. Father was not present. Mother explained that they had hired an exterminator to treat the house. She also said that the house had been treated before, but a more aggressive treatment was needed this time. Mother informed Condie that they were staying at her mother's home until the treatment was completed. Although Condie did notice some type of bug crawling on the kitchen ceiling, she ultimately decided that DCF intervention was not necessary because Mother had hired an exterminator to treat the house.

In March 2014, Condie came into contact with the family after she learned that the children had been placed in protective custody. The State's subsequently filed child in need of care petitions alleged that the children were without adequate parental care, control, or subsistence not solely due to the lack of financial means; without the care or control necessary for their health; and had been abused or neglected. The children were

placed with their maternal grandmother. When Condie dropped the children off, the children's grandmother told Condie that A.S. had reported hearing the parents talk about drugs. Condie was also aware of domestic violence concerns. In July 2014, each child was adjudicated as a child in need of care. These adjudications were not appealed.

Misty Schaefer, a caseworker with KVC Behavioral Healthcare (KVC), was assigned to the family's case prior to adjudication. Along with Condie, Father and his attorney, Mother's attorney, and the children's guardian ad litem, Schaefer developed a case plan for the family. She also scheduled visitation with the children and made herself available to supervise. The case plan called for weekly, 1-hour visits. Mother's first visit with the children occurred on March 13, 2014, about 2 weeks before the case plan was even created. Visits were also scheduled for March 27 and March 31, but Mother did not show up for those visits. Throughout the time she was on the case, Schaefer had difficulty contacting Mother.

At some point Mother told Schaefer that she had filed for divorce from Father. Schaefer thought that Mother's decision to divorce Father was appropriate because of the domestic violence concerns. Mother, however, continued to still maintain a relationship with Father, which concerned Schaefer because of the impact that domestic violence can have on children. At a meeting with Schaefer in March 2014, Mother claimed that the children were never in danger. But Schaefer was still concerned because of how domestic violence can even traumatize those who only witness it. During a meeting at the end of April 2014, Mother told Schaefer that Father had held her against her will in a basement for some period of time before April 7, 2014.

Mother's second visit occurred on May 1, 2014, and she was 30 minutes late. There were no visits between March 13 and May 1. The next visit was May 5, 2014. A visit was scheduled for 1 week later on May 12, but Mother did not attend. Even though she tried, Schaefer was not able to arrange any more visits before she left the case on

3

June 30, 2014. In fact, Schaefer did not have any more contact with Mother after she missed the May 12 visit.

While Schaefer was assigned to the case, Mother never submitted to drug testing as required by the case plan. Mother failed to provide urine samples for testing on March 18, April 4, and April 17, which Mother reported as being during the time she was held against her will. She also did not provide urine samples on six other occasions. Schaefer was able to confirm that Mother had stayed at a shelter but was unable to confirm that Mother had received therapy there as Mother had claimed. Mother had told Schaefer that she had transportation but that money for gas was a struggle. To remedy this issue, Schaefer provided Mother a gas card. Schaefer also made referrals for parenting classes, a domestic violence assessment, and anger management.

In June 2014, Schaefer developed a 6-month reintegration plan for Mother to complete. Although she was not in contact with Mother, Schaefer had to create the plan without Mother because it had been court ordered to be submitted within a certain time frame. Schaefer, who was transitioning off the case, asked her successor to continue trying to reach Mother in order to go over the plan with her.

Schaefer left the family's case in July 2014, and a second caseworker was assigned. A third caseworker, Katelin Saunders, was assigned in October 2014, and she remained on the family's case until April 2015. When Saunders was assigned, there were 60 days left on the reintegration plan. Saunders was able to meet with Mother in November and December of 2014 and January and April of 2015. In those meetings Saunders went over the reintegration plan tasks with Mother. During Saunders' time on the family's case, Mother never provided proof of housing and did not notify Saunders of where she was living as she continued to move around, both of which were requirements of the reintegration plan. Mother also maintained only minimal contact with KVC. There

4

were no monthly meetings in February or March of 2015, and Saunders often had trouble reaching Mother.

Mother never provided Saunders with proof of transportation, as required by the reintegration plan. In April 2015, Mother told Saunders that she had gotten her car back but was not able to drive it until she got updated tags. But Mother never proved that her tags had been updated. Mother also was required to take a parenting class, although the reintegration plan did not specify which class to take. The class Mother took was about talking to children about sex. Saunders thought that class might be appropriate for A.S. but was not appropriate for J.B. and M.B., who were both under the age of 7, and encouraged Mother to take another class. Mother never provided proof of taking another class. The record on appeal also indicates that Mother never provided proof of employment.

Between October 2014 and April 2015, Mother participated in four visits with the children. There were other scheduled visits, but Mother missed or canceled them. Of the four visits she attended, Mother was late to two of them. Mother claimed to have missed visits because she had been sick and in the hospital. She did not provide proof of hospitalization. Mother's last visit with the children was Christmas 2014. In January 2015, a no-contact order was put in place between Mother and the children. To lift the order, Mother was required to provide medical documentation, complete a hair follicle test, and submit a budget. The medical documentation was required because Mother was frequently sick, missing visits, and claimed to have a medical condition that prevented her from submitting urine samples. Mother was ordered to provide documentation after she submitted a urine sample with no temperature.

The only medical documentation that Mother provided were documents from a 2011 visit to the emergency room. The documents mentioned Nutcracker Syndrome, but Saunders was looking for something more current. Saunders also did not believe that the

5

documents constituted sufficient medical documentation of a diagnosis and wanted input from her supervisor. Mother did submit a budget, but she did not complete a hair follicle test. In January 2015, Mother did provide a urine sample, which was clean. But she failed to provide proof of submitting any other samples for testing.

Saunders arranged for Mother to have a psychological evaluation done in February 2015. Mother cancelled the appointment and then did not show when it was rescheduled. The referral for the evaluation was delayed because Mother indicated that she could get it done at a shelter, otherwise it would have been made sooner. Mother never provided proof of completing a psychological evaluation. She did report that she had completed a domestic violence assessment, which recommended that she receive therapy. But Mother never provided proof that she had completed the assessment or participated in therapy.

KVC not only managed and supervised Mother's completion of the case plan, it also provided services to the children. Both A.S. and J.B. received individual therapy, and M.B. received play therapy and individual therapy. After A.S. began exhibiting some depressive behaviors, Saunders worked with the children's placement, their grandmother, to come up with safety plans. Some of A.S.'s stress was the result of having flashbacks of her stepdad beating Mother. A.S. experienced some problems at school with bullying and at one point had to be hospitalized due to cutting and suicidal ideations. A.S. also exhibited parentified behavior, trying to fill the void left by Mother's travails.

At the beginning of April 2015, Saunders and her supervisor, Alyssa Hillman, met with Mother. They told Mother that Saunders would be transitioning off the family's case and because the case was being set for termination, Hillman would be taking over. Mother was late to the meeting because she had to borrow a friend's car, which caused Hillman to be concerned about Mother's transportation. The meeting began well, and Mother was able to provide some information and report what she was working on. But then Mother got frustrated and angry. Although she initially calmed down and agreed to

6

submit a urine sample, Mother became angry again and stormed out without providing a sample. Hillman tried every other week to get ahold of Mother. She had no contact with Mother between April 1 and June 25, 2015. During this time, Mother never called to check on the children or schedule a visit.

On June 25, 2015, Hillman received a phone call from someone working at a mental health center where Mother was apparently receiving treatment. The caller suggested that KVC was acting inappropriately in seeking termination of Mother's parental rights. Hillman refused to speak specifically about Mother's case. Later that day, the mental health worker called back with Mother on the line. Hillman explained to Mother that she had been trying to get ahold of Mother for months. Mother became upset, stating that she had received only two phone messages. She also accused Hillman of being verbally aggressive during the April meeting.

No meeting was scheduled during the phone call, but some tasks for Mother to complete were established. Mother reported that she was looking for employment, even though at the April meeting she had said she was employed and looking for a second job. Hillman told Mother that she needed to start taking drug tests and that she had to show some consistency before visits with the children could be scheduled. Mother never provided proof of completing any drug testing. Hillman also sent a release to the mental health center that was working with Mother, but it was never returned.

An evidentiary hearing was held on July 17, 2015, on the State's motion to terminate parental rights of all three children. The State asked the district court to terminate Mother's parental rights as to J.B. and M.B. and appoint a permanent custodian for A.S. Before the hearing began, A.S.'s natural father agreed to the creation of a permanent custodianship for A.S. Also, at the beginning of the hearing, the State and the children's guardian ad litem asked the district court to take judicial notice of 15 prior cases involving Mother and Father, including two cases where Mother was criminally

7

charged: 13 DV 1430 and 02 DV 1274. The State presented the DCF social worker, two of the caseworkers that had been assigned to the family's case, and the family's case supervisor as witnesses.

Mother also testified. She said that she was being treated for Post-Traumatic Stress Disorder (PTSD), severe anxiety, and major depressive disorder. She also testified that she was receiving individual therapy. The maternal grandmother of the children testified that 6 weeks before the evidentiary hearing she had reconnected with Mother and that Mother seemed more stable. But she also admitted that before she started having regular contact with Mother, she had been concerned about Mother's safety and whereabouts and had even be afraid that Mother might have been dead.

The district court took the matter under advisement. Mother asked the district court to issue a written memorandum decision. The district court issued its decision on October 19, 2015. Near the beginning of the decision, the district court noted that it had taken judicial notice of 15 cases, as the State and the children's guardian ad litem had requested. In reciting the facts of the case, and in considering Mother's fitness, the district court stated that Mother had been a "perpetrator of domestic violence." Ultimately, it determined that based on the presence of several statutory factors, Mother was unfit and that her unfitness was unlikely to change in the foreseeable future. The district court also specifically found that terminating Mother's parental rights as to J.B. and M.B. and creating a permanent custodianship for A.S. was in the children's best interests.

Mother has timely appealed from the district court's decisions.

ANALYSIS

*Judicial notice of Mother's prior criminal cases*

Mother first claims that the district court should not have considered her prior criminal cases because it improperly found that she had been a "'perpetrator of domestic violence.'" Both parties urge this court to apply an abuse of discretion standard of review.

When the admission of evidence is challenged, an appellate court uses a multistep analysis. See *State v. King*, 299 Kan. 372, 383, 323 P.3d 1277 (2014). The first step is to consider relevance, which is defined as evidence that is probative and material. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010) (citing K.S.A. 60-401[b]). Whether evidence was probative is governed by an abuse of discretion standard and materiality is governed by a de novo standard. The second step is to identify which legal principles or rules of evidence apply. This determination is also reviewed de novo. The third step is the application of those rules or principles, which can involve reviewing the district court's discretion or considering matters of law. 290 Kan. at 817.

Neither Mother nor the State address relevance, so we will not address it either. Both parties do agree that the applicable rule regarding judicial notice is K.S.A. 60-409. As mentioned, once the applicable rule or principle has been identified, it should be applied to the facts of the case, and the standard of review used by an appellate court depends on the identified rule or principle. *Shadden*, 290 Kan. at 817. The cited statute makes clear that a district court has discretion to take judicial notice of some kinds of information. See *State v. McDonald*, 222 Kan. 494, 495-96, 565 P.2d 267 (1977); *Van Welden v. Ramsay's Inc.*, 199 Kan. 417, 422, 430 P.2d 298 (1967); *State v. Gordon*, No. 102,386, 2010 WL 4320354, at *4 (Kan. App. 2010) (unpublished opinion). Thus, as the parties suggest, an abuse of discretion standard of review ultimately applies. A district court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable; (2)

9

based on an error of law; or (3) based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

First, before the merits of the claim are considered, Mother's preservation of this issue must be addressed. Mother's counsel did not make a contemporaneous objection to the district court taking judicial notice of the 15 prior cases as requested by the State and the guardian ad litem. K.S.A. 60-404 generally prevents an appellate court from reviewing an evidentiary challenge without a timely objection made on the record "'and so stated as to make clear the specific ground of objection.'" *Foster v. Stonebridge Life Ins. Co.*, 50 Kan. App. 2d 1, 25, 327 P.3d 1014 (2012). In *In re Kerns*, 225 Kan. 746, 749, 594 P.2d 187 (1979), a parental rights case, the district court took judicial notice of some material from a juvenile court file. The parents' counsel did not object, even after direct questioning from the district court. On appeal, our Supreme Court found no error in the admission of the evidence, citing the contemporaneous objection rule. 225 Kan. at 749.

Here, the only reason Mother provides for not objecting is that her "counsel presumed that the court would follow the law and use those judicially noticed cases within the scope of K.S.A. 60-409." Because Mother did not object at the evidentiary hearing, this court will not normally review this issue on appeal.

But had she properly preserved it, Mother might have prevailed on her claim. K.S.A. 60-409(b) provides that a district court can take judicial notice of:

"(1) private acts and resolutions of the Congress of the United States and of the legislature of this state, and duly enacted ordinances and duly published regulations of governmental subdivisions or agencies of this state, and (2) the laws of foreign countries and (3) such facts as are so generally known or of such common notoriety within the

territorial jurisdiction of the court that they cannot reasonably be the subject of dispute, and (4) specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy."

In this case, the district court, after taking judicial notice of Mother's prior criminal cases, found that she had been a "perpetrator of domestic violence" against Father in 13 DV 1430 and against her mother in 02 DV 1274. It later relied on this finding when determining that Mother was unfit. In 13 DV 1430, however, the State dismissed the case. And in 02 DV 1274, Mother was granted diversion. Mother pleaded not guilty in both cases. The State briefly argues that the district court could have noted 13 DV 1430 to show "the discordant relationship with Father, through litigiousness or opposing claims of domestic abuse, and the effect that had on the children." But because Mother pleaded not guilty, and because neither 13 DV 1430 nor 02 DV 1274 were actually adjudicated, whether she was a "perpetrator of domestic violence" could reasonably be the subject of dispute, making judicial notice improper. See K.S.A. 60-409(b).

Mother also mentions that the district court erred in focusing on that she had not divorced Father. The district court did take judicial notice of 14 DV 0462, which was Father's prosecution for crimes committed against Mother. The record indicates that Mother testified against Father at the preliminary hearing in that case. Mother claims that the fact she had testified against Father showed that she had, contrary to the district court's findings, followed through against Father. But other than stating that no reasonable person would have made the same determination within the scope of K.S.A. 60-409, Mother does not explain how the district court erred in taking judicial notice of 14 DV 0462. She also fails to provide any authority in support of her argument. Further, consideration of this issue is unnecessary because the district court erred in taking judicial notice of 13 DV 1430 and 02 DV 1274.

11

But even if Mother had properly preserved this issue for appeal, and even if we were to find that the district court erred, we would be compelled to conclude that the error was harmless. See *In re J.R.*, No. 104,975, 2011 WL 2175953, at \*3 (Kan. App. 2011) (unpublished opinion) (citing *In re J.D.C.*, 35 Kan. App. 2d 908, 915, 136 P.3d 950 [2006], *aff'd* 284 Kan. 155, 159 P.3d 974 [2007]); see also *In re K.B.J.*, No. 102,922, 2010 WL 348294, at \*2 (Kan. App. 2010) (unpublished opinion) (applying the same harmless error standard in a termination of parental rights case involving a judicial notice issue), *rev. denied* 290 Kan. 1094 (2010). K.S.A. 2015 Supp. 60-261 provides:

"Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

When a district court errs in admitting evidence at trial, the result will be reversed only if the admission influenced the outcome of the trial and denied substantial justice. *State v. Ransom*, 289 Kan. 373, 388, 212 P.3d 203 (2009). Or, in other words, whether the admitted evidence had any likelihood of changing the trial's outcome. *State v. Boggs*, 287 Kan. 298, 319, 197 P.3d 441 (2008). In making this determination, this court considers the whole record. *State v. Garcia*, 282 Kan. 252, 270, 144 P.3d 684 (2006).

Here, when the record is viewed as a whole, the district court's error in taking judicial notice of 13 DV 1430 and 02 DV 1274 did not have any likelihood of changing the trial's outcome. As we will be note in the following sections, the district court, regardless of its error in taking judicial notice of Mother's prior criminal cases and finding that she had been a "perpetrator of domestic violence," did not err in terminating Mother's parental rights. Thus, reversal is not required.

*The district court's findings on Mother's unfitness*

As her second issue, Mother claims the district court's findings that she was unfit and that her unfitness was unlikely to change in the foreseeable future were not supported by clear and convincing evidence.

When reviewing a district court's finding of unfitness, we employ a clear and convincing evidence standard of review. See K.S.A. 2015 Supp. 38-2269(a). In other words, we consider whether we are convinced that a rational factfinder, viewing the evidence in the light most favorable to the State, "could have found it highly probable, *i.e.*, by clear and convincing evidence" that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). We "[do] not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

A. *Mother's unfitness*

Once a child has been adjudicated as a child in need of care, parental rights may be terminated if "the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2015 Supp. 38-2269(a). A nonexclusive list of factors that a district court may consider when making this determination is provided in K.S.A. 2015 Supp. 38-2269(b) and (c). Any one factor may, but does not necessarily, "establish grounds for termination of parental rights." K.S.A. 2015 Supp. 38-2269(f). A district court may also consider nonstatutory factors. See K.S.A. 2015 Supp. 38-2269(b). As the petitioner, the State bears the burden of proof. K.S.A. 2015 Supp. 38-2250.

The district court in this case terminated Mother's parental rights based on the presence of the following statutory factors:

- K.S.A. 2015 Supp. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;
- K.S.A. 2015 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meets the needs of the child;
- K.S.A. 2015 Supp. 38-2269(c)(2)—failure to maintain regular visitation, contact, or communication with the child; and
- K.S.A. 2015 Supp. 38-2269(c)(3)—failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home.

### 1. *Failure of reasonable efforts*

DCF and KVC did several things to rehabilitate the family. They arranged the children's care; set-up and paid for their placement; and provided them with medical cards, therapy, and medical services. They also created a reintegration plan and case plans for Mother to complete. KVC caseworkers attempted to stay in contact with Mother. KVC also arranged for Mother to participate in a color code system intended to track her drug use. It scheduled and attended visitations with the children. KVC referred Mother to a domestic violence assessment and parenting classes. And it arranged for Mother to have a psychological evaluation and provided her with a gas card.

Mother argues that KVC, in making reasonable efforts to rehabilitate the family, was required to provide her with rehabilitative services. Specifically, she contends that (1) KVC failed to address her domestic violence and mental health issues; (2) a caseworker testified that visitation was not a service; (3) the case supervisor testified that she did not know how the reasonable efforts requirement was satisfied; and (4) a gas card and a belated offer to arrange a mental health evaluation were insufficient.

Mother, however, overlooks what else KVC did to rehabilitate the family, which we described above. K.S.A. 2015 Supp. 38-2269(b)(7) requires relevant agencies to make

reasonable efforts, but it does not require them to make "a herculean effort to lead the parent through the responsibilities of the reintegration plan." See *In re J.R.*, No. 104,975, 2011 WL 2175953, at *5 (Kan. App. 2011) (unpublished opinion). Further, KVC may have been able to help Mother more had she stayed in better contact. Several of the caseworkers testified that on different occasions, and for extended periods of time, they had trouble contacting Mother.

### 2. *Lack of effort to adjust*

As the district court noted, Mother remained married to Father throughout this case, even though he had been violent towards her. The DCF social worker testified that when she interviewed Mother after the children had been placed in protective custody, Mother said that the children did not witness any domestic violence. The record indicates, however, that A.S. did see Father beat Mother and appeared to be traumatized by witnessing it. The evidence also showed that Mother failed to acquire transportation, arrange appropriate housing, or find employment.

Mother argues that she has taken steps toward separating herself from Father as evidenced by her testifying against him at his preliminary hearing. She also states that the evidence showed she adjusted her circumstances by completing tasks, even though clear and convincing evidence showed that her completion of tasks was not always documented. Although Mother testified against Father, it appears from the record that she had not taken the necessary steps to completely sever the relationship. Mother testified that she was trying to figure out how to refile for divorce. She also testified that she was being treated for PTSD, anxiety, and major depressive disorder. She did not, however, provide any documentation of her treatment.

15

### 3. *Failure to visit and communicate*

The children were placed in custody on March 6, 2014, and Mother had her first visit on March 13, 2014. Visits were scheduled for March 27 and 31, but Mother did not show. Mother's next visits were May 1 and May 5. There were no visits between May 5 and September 9. From the end of October 2014 to December 25, 2014, there were only four visits. No visits were allowed after January 1, 2015, because of the no-contact order that was put in place. When the evidentiary hearing was held in July 2015, Mother had not seen her children since December 2014. The evidence also showed that Mother had not called to check on her children.

Mother argues that the district court and KVC continued to increase the requirements she had to satisfy in order to have visits. She claims that she took a parenting class, but KVC did not approve of the one she took. She claims that she provided documentation of her medical condition to lift the no-contact order, but KVC found it insufficient. Mother also states that although she had limited contact with KVC, she maintained regular contact with her mother.

The parenting class that Mother took, however, was about talking to your kids about sex. Mother's caseworker testified that the class might have been appropriate for A.S., but not for J.B. and M.B., who were both under 7 years old. Mother was told to take a more age-appropriate class, but she never provided proof of doing so. And even if KVC had accepted the medical documentation that Mother provided, visits would not have occurred because KVC had limited contact with Mother from January 2015 to June 2015. Further, Mother's regular contact with her mother began only 6 weeks before the evidentiary hearing, and her mother also testified that she had recently been concerned about her daughter's safety and had even feared that Mother might have been dead.

### 4. *Failure to complete the reintegration plan*

As noted, KVC formulated a reintegration plan for Mother to complete. The plan required Mother to complete several tasks, including:  maintain and provide documentation of stable housing, transportation, and employment; maintain a safe and stable home environment; participate in family therapy; complete a domestic violence assessment; complete a psychological evaluation; complete parenting classes; follow the KVC visitation schedule; keep in regular contact with KVC; submit urine samples; and provide the documentation necessary to show that the tasks have been completed.

As already mentioned, Mother failed to acquire transportation, arrange appropriate housing, or find employment. She also failed to keep in regular contact with KVC. Mother also did not complete urinalysis tests, a psychological evaluation, or a domestic violence assessment. The only task that Mother appears to have completed was the parenting class, which was not age-appropriate. Further, Mother admits on appeal that the evidence showed that she did not document her completion of many of the assigned tasks, and providing documentation was itself an assigned task. The only documentation Mother seems to have provided showed she had been approved for rental assistance but did not indicate that she had received housing.

Mother provides little argument on this issue. She relies on evidence that showed she was receiving mental health treatment from somewhere other than KVC. But KVC did not receive from that provider any documentation of an intake, recommended treatment, treatment plans, diagnoses that had been made, or evaluations that had been done. Therefore, when viewed in the light most favorable to the State, the evidence demonstrates that a rational factfinder could have found, based on the presence of the statutory factors listed in K.S.A. 38-2269(b)(7), (b)(8), (c)(2), and (c)(3), that Mother was unfit. The district court thus did not err by finding Mother unfit.

17

B. *Foreseeable future*

As noted, a district court may terminate parental rights if "the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child *and* the conduct or condition is unlikely to change in the foreseeable future." (Emphasis added.) K.S.A. 2015 Supp. 38-2269(a). The term "'foreseeable future'" is measured from a child's perspective, taking into account his or her perception of time, which can be as little as 7 months. See *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). In predicting a parent's future unfitness, this court may look to his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

One of the caseworkers assigned to the family's case testified that when she left the case she did not believe Mother was in a position to appropriately care for the children and that Mother's situation was not likely to change in the immediate or foreseeable future. The reason for this conclusion was that in the 6 months the caseworker had been on the case, nothing had changed. Mother said she was doing things to improve but never provided any documentation. The caseworker also referenced that Mother had not seen the children in over 6 months. The family's case supervisor also testified that she did not have any documentation to support a conclusion that Mother was currently fit to care for the children because Mother had not provided any. The case supervisor also stated that Mother's unfitness was unlikely to change in the immediate or foreseeable future because there had been inconsistencies for over 1 year. Later during her testimony, the case supervisor repeated that any improvement was unlikely to occur in the immediate or foreseeable future.

In arguing that she is now more stable, Mother relies on her own testimony from the evidentiary hearing. She also reiterates that the district court erred in taking judicial notice of the prior cases and that the error poisoned the rest of its findings, citing the

18

district court statement that it could look to her past to predict the future. But Mother's reliance on her own testimony is unpersuasive because she still failed to provide any documentation. Also, Mother had limited contact with KVC in the 5 months preceding the evidentiary hearing, which shows that even though she may have been more stable she was not more consistent. And the district court's decision to take judicial notice of the cases did not affect this issue because Mother's history in this case is enough to predict the future, regardless of whether the district court was including her criminal history. Therefore, the district court did not err in finding Mother unfit for the foreseeable future.

*The children's best interests*

Mother finally claims that the district court abused its discretion in terminating her parental rights as to J.B. and M.B. and appointing a permanent custodian for A.S.

If the district court makes an unfitness finding, it "shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2015 Supp. 38-2269(g)(1). The district court is in the best position to determine a child's best interests because it hears the evidence directly, and this court will overturn the determination only if the district court has abused its discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* October 7, 2010. Judicial discretion is abused when no reasonable person would take the district court's position or when the district court's decision is based on an error of law or an error of fact. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011).

At the evidentiary hearing, one of the family's caseworkers testified that when she left the case she believed that termination of Mother's parental rights was in the children's best interests because they were stable with their grandmother and that was the best place for them. The family's case supervisor also testified that it was her professional opinion

19

that terminating Mother's parental rights was in the children's best interests because of the amount of time that they had been in placement, Mother's lack of contact, and Mother's failure to complete assigned tasks.

In her brief, Mother points out the evidence of the children's emotional issues. She also argues that there was no testimony that a permanent custodianship was in A.S.'s best interests. But the testimony regarding the children's emotional issues was given by the caseworker and the case supervisor—and they were the same witnesses who testified that it was in the children's best interests to terminate Mother's parental rights. Further, while there was no direct testimony that creating a permanent custodianship was in A.S.'s best interests, testimony was presented that a permanent custodianship was not suitable for J.B. and M.B. because of their age, seeming to imply that it would be more appropriate for A.S. A permanent custodianship is also what the State requested for A.S. and what her biological father agreed to.

Based on the testimony presented, a reasonable person could have reached the same conclusion as the district court. The district court thus did not abuse its discretion when it found that terminating Mother's parental rights as to J.B. and M.B. and appointing a permanent custodian for A.S. was in the children's best interests.

Affirmed.